**[J-72A-2018, J-72B-2018, J-72C-2018, J-72D-2018, J-72E-2018, J-72F-2018, J-72G-2018 and J-72H-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| PENNSYLVANIA RESTAURANT AND LODGING ASSOCIATION, STORMS RESTAURANT AND CATERING, LLC D/B/A STORMS RESTAURANT, LAWRENCEVILLE BREWERY, INC., D/B/A THE CHURCH BREW WORKS, 1215 INCORPORATED, D/B/A RITA'S ITALIAN ICE, DIRT DOCTORS CLEANING SERVICE LLC, AND MODERN CAFE INC. | : : : : : : : : : : : : | No. 57 WAP 2017 |
| | : | Appeal from the Order of the Commonwealth Court entered May 17, 2017 at No. 79 CD 2016, affirming the Order of the Court of Common Pleas of Allegheny County entered December 21, 2015 at No. GD 15-16442. |
| | : : : : : : : : | ARGUED: October 23, 2018 |
| v. | : : : : : | |
| CITY OF PITTSBURGH | : : : : | |
| v. | : : : : : : : | |
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : : : : : : | |
| APPEAL OF: SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : : : : | |
| PENNSYLVANIA RESTAURANT AND LODGING ASSOCIATION, STORMS RESTAURANT AND CATERING, LLC, D/B/A STORMS RESTAURANT, LAWRENCEVILLE BREWERY, INC., D/B/A THE CHURCH BREW WORKS, 1215 INCORPORATED, D/B/A RITA'S ITALIAN ICE, DIRT DOCTORS CLEANING SERVICE LLC, AND MODERN CAFE INC. | : : : : : : : : : : : | No. 58 WAP 2017 |
| | : : : : : : : | Appeal from the Order of the Commonwealth Court entered May 17, 2017 at No. 101 CD 2016, affirming the Order of the Court of Common Pleas of Allegheny County entered December 21, 2015 at No. GD 15-16442. |

|  |  |
|---|---|
|  | : ARGUED: October 23, 2018 |
|  | : |
|  | : |
| v. | : |
|  | : |
|  | : |
|  | : |
| CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO, AND SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32 BJ | : |
|  | : |
|  | : |
|  | : |
|  | : |
|  | : |
|  | : |
|  | : |
| APPEAL OF: SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : |
|  | : |
|  | : |
| BUILDING OWNERS AND MANAGERS ASSOCIATION OF PITTSBURGH | : No. 59 WAP 2017 |
|  | : |
|  | : Appeal from the Order of the |
|  | : Commonwealth Court entered May 17, |
| v. | : 2017 at No. 100 CD 2016, affirming |
|  | : the Order of the Court of Common |
|  | : Pleas of Allegheny County entered |
| CITY OF PITTSBURGH, COUNCIL OF | : December 17, 2015 at No. GD 15- |
| THE CITY OF PITTSBURGH, AND | : 13329. |
| WILLIAM PEDUTO, AND SERVICE | : |
| EMPLOYEES INTERNATIONAL UNION | : ARGUED: October 23, 2018 |
| LOCAL 32 BJ | : |
|  | : |
|  | : |
| APPEAL OF: SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : |
|  | : |
|  | : |
| BUILDING OWNERS AND MANAGERS ASSOCIATION OF PITTSBURGH | : No. 60 WAP 2017 |
|  | : |
|  | : Appeal from the Order of the |
|  | : Commonwealth Court entered May 17, |
| v. | : 2017 at No. 102 CD 2016, affirming |
|  | : the Order of the Court of Common |
|  | : Pleas of Allegheny County entered |
| CITY OF PITTSBURGH, COUNCIL OF | : December 17, 2015 at No. GD 15- |
| THE CITY OF PITTSBURGH, AND | : 13329. |
| WILLIAM PEDUTO, AND SERVICE | : |
| EMPLOYEES INTERNATIONAL UNION | : ARGUED: October 23, 2018 |
| LOCAL 32BJ | : |
|  | : |
|  | : |

[J-72A-2018, J-72B-2018, J-72C-2018, J-72D-2018, J-72E-2018, J-72F-2018, J-72G-2018 and J-72H-2018] - 2

| | | |
|---|---|---|
| APPEAL OF:  SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : | |
| | : | |
| BUILDING OWNERS AND MANAGERS ASSOCIATION OF PITTSBURGH | : | No. 61 WAP 2017 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court entered May 17, |
| v. | : | 2017 at No. 100 CD 2016, affirming |
| | : | the Order of the Court of Common |
| | : | Pleas of Allegheny County entered |
| CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO, AND SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : | December 17, 2015 at No. GD 15-13329. |
| | : | |
| | : | |
| | : | ARGUED:  October 23, 2018 |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO | : | |
| | : | |
| | : | |
| BUILDING OWNERS AND MANAGERS ASSOCIATION OF PITTSBURGH | : | No. 62 WAP 2017 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court entered May 17, |
| v. | : | 2017 at No. 102 CD 2016, affirming |
| | : | the Order of the Court of Common |
| | : | Pleas of Allegheny County entered |
| CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO, AND SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | : | December 17, 2015 at No. GD 15-13329. |
| | : | |
| | : | |
| | : | ARGUED:  October 23, 2018 |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO | : | |
| | : | |
| | : | |
| PENNSYLVANIA RESTAURANT AND LODGING ASSOCIATION, STORMS RESTAURANT AND CATERING, LLC, D/B/A STORMS RESTAURANT, LAWRENCEVILLE BREWERY, INC., D/B/A THE CHURCH BREW WORKS, 1215 INCORPORATED, D/B/A RITA'S | : | No. 63 WAP 2017 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court entered May 17, |
| | : | 2017 at No. 79 CD 2016, affirming the |
| | : | Order of the Court of Common Pleas |
| | : | of Allegheny County entered |

| | |
|---|---|
| ITALIAN ICE, DIRT DOCTORS CLEANING SERVICE LLC, AND MODERN CAFE INC. | December 21, 2015 at No. GD 15-16442. |
| | ARGUED: October 23, 2018 |
| v. | |
| CITY OF PITTSBURGH | |
| v. | |
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | |
| APPEAL OF: CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO | |
| PENNSYLVANIA RESTAURANT AND LODGING ASSOCIATION, STORMS RESTAURANT AND CATERING, LLC, D/B/A STORMS RESTAURANT, LAWRENCEVILLE BREWERY, INC., D/B/A THE CHURCH BREW WORKS, 1215 INCORPORATED, D/B/A RITA'S ITALIAN ICE, DIRT DOCTORS CLEANING SERVICE LLC, AND MODERN CAFE INC. | No. 64 WAP 2017 |
| | Appeal from the Order of the Commonwealth Court entered May 17, 2017 at No. 101 CD 2016, affirming the Order of the Court of Common Pleas of Allegheny County entered December 21, 2015 at No. GD 15-16442. |
| | ARGUED: October 23, 2018 |
| v. | |
| CITY OF PITTSBURGH, COUNCIL OF THE CITY OF PITTSBURGH, AND WILLIAM PEDUTO, AND SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ | |

APPEAL OF:  CITY OF PITTSBURGH,         :
COUNCIL OF THE CITY OF
PITTSBURGH, AND WILLIAM PEDUTO


**OPINION**


**JUSTICE WECHT**                **DECIDED:  JULY 17, 2019**

Pennsylvania long has sought to balance carefully the time-honored prerogatives of local governance with the countervailing state interest in providing a hospitable environment for commercial activity.  In its recent enactment of two ordinances that impose certain obligations upon local businesses, the City of Pittsburgh approached the fulcrum between these competing priorities.  The Paid Sick Days Act ("PSDA"),[1] as its name suggests, entitles employees to accrue paid sick leave.  The Safe and Secure Buildings Act ("SSBA")[2] imposes education and training obligations upon building owners and their employees in furtherance of disaster preparedness, counterterrorism, and related concerns.  We are asked to consider whether these ordinances run afoul of the qualified statutory preclusion of local regulations that burden business.  We hold that the PSDA does not exceed those limitations, and that the SSBA does exceed them.

## I.  HISTORICAL AND LEGAL CONTEXT

Historically, "municipal corporations are creatures of the State and . . . the authority of the Legislature over their powers is supreme. . . .  Municipal corporations have no inherent powers and may do only those things which the Legislature has expressly or by

---

[1]      PITTSBURGH CODE §§ 626.01-626.13.

[2]      PITTSBURGH CODE §§ 410.01-410.09.

necessary implication placed within their power to do." *Denbow v. Borough of Leetsdale*, 729 A.2d 1113, 1118 (Pa. 1999) (quoting *Knauer v. Commonwealth*, 332 A.2d 589, 590 (Pa. Cmwlth. 1975)).[3] The Constitution of 1968 turned this principle on its head. Article IX of the Pennsylvania Constitution of 1968 provides:

> Municipalities shall have the right and power to frame and adopt home rule charters. Adoption, amendment or repeal of a home rule charter shall be by referendum. The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. If the General Assembly does not so provide, a home rule charter or a procedure for framing and presenting a home rule charter may be presented to the electors by initiative or by the governing body of the municipality. A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

PA. CONST. art. IX, § 2. By virtue of this revision, any power that the General Assembly did not forbid was now extended to any municipality that—like the City of Pittsburgh— adopted home rule. *See City of Phila. v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004) (holding that, "[u]nder the concept of home rule, . . . the locality in question may legislate

---

[3]     This bedrock legal principle sometimes is referred to as "Dillon's Rule," after Judge John F. Dillon, who explained:

> Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control. Unless there is some constitutional limitation on the right, the legislature might, by a single act, if we can suppose it capable of so great a folly and so great a wrong, sweep from existence all of the municipal corporations in the State, and the *corporation* could not prevent it. We know of no limitation on this right so far as the corporations themselves are concerned. They are, so to phrase it, the mere *tenants at will* of the legislature.

*City of Clinton v. Cedar Rapids & M.R.R. Co.*, 24 Iowa 455, 475 (1868) (emphasis in original).

concerning municipal governance without express statutory warrant for each new ordinance," provided it does so in a fashion allowed by its home rule charter and without running afoul of the Pennsylvania Constitution or state statutory law).

In 1996, the General Assembly enacted the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. §§ 2901-3171 (hereinafter, "the HRC"). Echoing Article IX, Section 2, of our Constitution, the HRC extends home-rule authority only to "function[s] not denied by the Constitution of Pennsylvania, by statute or by [the municipality's] home rule charter." 53 Pa.C.S. § 2961; *see City of Pittsburgh v. Fraternal Order of Police, Ft. Pitt Lodge No. 1*, 161 A.3d 160, 170 (Pa. 2017) (quoting *Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132, 1144 (Pa. 2009)). Thus, no home rule charter may confer upon a home-rule municipality "power or authority" that is "contrary to or in limitation or enlargement of powers granted by statutes which are applicable to a class or classes of municipalities." 53 Pa.C.S. § 2962(a). Notwithstanding these limitations, "a home-rule municipality's exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation." *SEPTA v. City of Phila.*, 101 A.3d 79, 88 (Pa. 2014). The HRC instructs that "[a]ll grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality." 53 Pa.C.S. § 2961. Accordingly, when we find ambiguity in the scope of municipal authority or the limitations imposed thereon, we must resolve that ambiguity in the municipality's favor. *Nutter v. Dougherty*, 938 A.2d 401, 411 (Pa. 2007) (citing *Cty. of Delaware v. Twp. of Middletown*, 511 A.2d 811, 813 (Pa. 1986)).

Home rule incorporates and reinforces local municipalities' traditional police powers. In *Balent v. City of Wilkes-Barre*, 669 A.2d 309 (Pa. 1995), we described "the

police power" as that which "promote[s] the health, safety and general welfare of the people." *Id.* at 314. In *Adams v. City of New Kensington*, 55 A.2d 392 (Pa. 1947), interpreting the Third Class City Law's "general welfare clause," we explained that courts regard such provisions "as ample authority for the reasonable exercise, bona fide, of broad and varied municipal activity to protect the health, morals, peace and good order of the community." *Id.* at 395.[4]

In explicating the police powers enjoyed by the State, which are broader than, and necessarily superior to, the police powers possessed by counties and municipalities, we have explained:

> The "police power" is one of the "most essential powers of government . . . ." *Hadacheck v. Sebastian*, 239 U.S. 394 (1915). It has been variously defined as the power "to promote the public health, morals or safety and the general well-being of the community," *Commonwealth v. Harmar Coal Co.*, 306 A.2d 308, 316 (Pa. 1973); *see DePaul v. Kauffman*, 272 A.2d 500, 504 (Pa. 1971), or as "the inherent power of a body politic to enact and enforce laws for the promotion of the general welfare," *Commonwealth v. Barnes & Tucker*, 371 A.2d 461, 465 (Pa. 1977), or as a power extending to "all the great public needs," *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424 (1952). The police power is fundamental because it enables "civil society" to respond in an appropriate and effective fashion to changing political, economic, and social circumstances, and thus to maintain its vitality and order. *See, e.g., Mugler v. Kansas*, 123 U.S. 623, 668 (1887).

*Nat'l Wood Preserves, Inc. v. Commonwealth, Dep't of Env't Res.*, 414 A.2d 37, 42 (Pa. 1980) (citations modified; footnote omitted).

---

[4]     The Second Class City Code, which would govern the City of Pittsburgh absent its home-rule election, grants authority to "make regulations to secure the general health of the inhabitants, and to remove and prevent nuisances." 53 P.S. § 23145.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 2015 the Pittsburgh City Council passed and Mayor William Peduto (collectively, "the City") signed the PSDA and the SSBA. In each Ordinance, the City provided prefatory recitations of the purported sources of its authority to enact the legislation. *See* PSDA § 626.01(c); SSBA § 410.02.

On the City's account, the PSDA seeks "to enhance the public health by ensuring that employees across the City of Pittsburgh are able to earn paid sick time." PSDA § 626.01(b). As statutory authority for that enactment, the City cites: the HRC itself; the Second Class Cities Code, 53 P.S. §§ 22101-28707 (hereinafter, "SCCC")[5]; and the Disease Prevention and Control Law of 1955, 35 P.S. §§ 521.1-521.21 (hereinafter, "DPCL").[6] *See* PSDA § 626.01(c).

Subject to various qualifications and exclusions that do not affect our analysis, the PSDA provides that employees of employers with fifteen or more employees are entitled to accrue up to forty hours of paid sick leave per year at a rate of one hour of leave for every thirty-five hours worked. Employers with fewer than fifteen employees also must provide paid sick leave at the rate of one hour of leave per thirty-five hours worked. However, these employers may limit accrued leave to twenty-four hours per year. *See* PSDA § 626.03.

For its part, the SSBA seeks "to enhance the safety requirements and standards currently in the Emergency Management and Preparedness Chapter of the Fire Prevention

---

[5]     Act of April 24, 1905, P.L. 307, *as amended*.

[6]     Act of April 23, 1956, P.L. (1955) 1510, *as amended*.

Code for the benefit of the public by ensuring that buildings are staffed with workers who receive the training necessary to protect its occupants and property." SSBA § 410.02. As statutory authority for this enactment, the City cites: HRC §§ 2961 and 2962(c)(4); the Emergency Management Services Code, 35 Pa.C.S. §§ 7501-7931 & 79a01-79a31 (hereinafter, "Emergency Code")[7]; and the SCCC, 53 P.S. § 25092. *See* SSBA § 410.02.

The SSBA's provisions apply to "covered properties," a term that encompasses commercial office buildings or complexes, retail buildings or complexes, health care facilities, museums, and "similar cultural institutions" occupying 100,000 or more square feet, as well as all colleges and universities, and all properties owned, managed, or occupied, wholly or in part, by the City. The SSBA's requirements apply variously to "[s]ecurity officers"[8] and "[b]uilding service employees."[9] While we consider the specific requirements of the SSBA in greater detail below, our review of the lower courts' rulings requires us to note only that the SSBA imposes an array of time-consuming education requirements that putatively ensure that employees of certain businesses and building

---

[7] *See* Act of Nov. 26, 1978, P.L. 1332, No. 323, *as amended*, 35 Pa.C.S. §§ 7101, *et seq*.

[8] "[A] person employed principally to perform one (1) or more of the following functions: protection of individuals or property from harm or unlawful or unauthorized activity; and deterrence, observation, detection and/or reporting of incidents in order to prevent or abate any harmful, unlawful or unauthorized activity," excluding all city, county, state, and federal law enforcement officers, as well as officers appointed by non-profit corporations as authorized by 22 Pa.C.S. § 501. SSBA § 410.03(e).

[9] "[A] person performing work in connection with the care and maintenance of property, such as a concierge, doorperson, cleaner, janitor, custodian, superintendent, porter, maintenance person, handyperson, . . . who regularly works at such property a minimum of sixteen (16) hours per week," excluding students employed by their educational institution. SSBA § 410.03(a).

facilities are capable of serving certain protective and investigative functions in the event of a plethora of events that imperil the health and safety of such facilities' occupants.

The above-captioned plaintiff-appellees (collectively, "Challengers")[10] filed suit seeking declaratory and injunctive relief, challenging the PSDA's and SSBA's validity on the basis that the HRC precludes the City from imposing the burdens those ordinances entail upon local employers. The Allegheny County Court of Common Pleas considered the challenges to both laws, and found, in separate decisions issued within four days of each other, that both ordinances were *ultra vires* as impermissible business regulations pursuant to Section 2962(f) of the HRC. That provision states:

> **Regulation of business and employment.—**A municipality which adopts a home rule charter shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, *except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities*. . . .

53 Pa.C.S. § 2962(f) (emphasis added) (hereinafter, the "Business Exclusion"). We review these trial court decisions in turn, focusing first upon the later-issued ruling concerning the PSDA, which the court analyzed at greater length.

The Pittsburgh Restaurant and Lodging Association, among others (collectively, "PRLA"[11]), challenged the PSDA. As noted above, the Business Exclusion precludes home-rule municipalities from determining "duties, responsibilities or requirements placed upon" businesses and employers unless authority to do so is "expressly provided" by

---

[10] Except where citing briefs, for simplicity's sake we refer to all plaintiffs below as "Challengers."

[11] All Challengers to the PSDA filed a joint brief before this Court.

statute. Thus, the trial court reviewed each of the putative statutory sources of authority proffered by the City.

First, the court rejected the City's invocation of the DPCL, which provides, in relevant part: "Municipalities which have boards or departments of health or county departments of health may enact ordinances or issue rules and regulations relating to disease prevention and control, which are not less strict than the provisions of this act or the rules and regulations issued thereunder by the board." 35 P.S. § 521.16(c). The court concluded that this grant of authority did not apply because the City does not have a municipal board or department of health.

The court next rejected the City's resort to the SCCC, 53 P.S. §§ 23103 and 23145 (collectively empowering second-class cities to "make regulations to secure the general health of the inhabitants, and to remove and prevent nuisances"). The Business Exclusion envisages reliance upon the express provision of authority by statutes "which are applicable to all municipalities or to a class or classes of municipalities." Evidently, the court construed that exception to refer only to such grants of authority when they govern the particular city asserting a challenged law-making authority. Thus, the trial court determined that SCCC § 23145 could not confer the authority asserted because the City lost its status as a second-class city governed by the SCCC when it elected to enact its home rule charter. Tr. Ct. Op. PSDA at 3 (citing *Danzilli v. Lomeo*, 944 A.2d 813, 815 n.6 (Pa. Cmwlth. 2008)).

The trial court concluded as well that its disposition was controlled by this Court's decision in *Building Owners & Managers Association of Pittsburgh v. City of Pittsburgh*, 985 A.2d 711 (Pa. 2009) (hereinafter, "*BOMA—2009*"). In that case, this Court confronted

a challenge to a Pittsburgh ordinance requiring employers who obtained new service contracts to retain the employees of the prior contractor for no fewer than 180 days after the new contract took effect. By precluding the termination of the prior contractor's employees for 180 days, we held, the City had imposed an unauthorized "requirement" on City businesses as that term is used in the Business Exclusion.[12] For all of these reasons, the trial court ruled that the PSDA could not stand, and it granted judgment on the pleadings in favor of Challengers.

The trial court's analysis of the SSBA was more concise. Therein, the court did not expressly consider any of the City's cited sources of authority for the legislation. Instead, it repeated its brief discussion of *BOMA—2009*, and it ruled accordingly.

The City and the Service Employees International Union Local 32BJ (hereinafter, "SEIU") both appealed the trial court's decisions to the Commonwealth Court, which considered the cases *en banc* and affirmed both rulings in separate non-precedential decisions. *See Pa. Restaurant & Lodging Ass'n v. City of Pittsburgh*, 79 C.D. 2016, 101 C.D. 2016, 2017 WL 2153813 (Pa. Cmwlth. May 17, 2017) (*en banc* memorandum; hereinafter, "*PRLA*"); *Bldg. Owners & Managers Ass'n of Pittsburgh v. City of Pittsburgh*, 100 C.D. 2016, 102 C.D. 2016, 2017 WL 2153216 (Pa. Cmwlth. May 17, 2017) (*en banc* memorandum).

With regard to the PSDA, the Commonwealth Court ruled that the provisions the City cited as express statutory authorizations for the PSDA were insufficient to except that enactment from the Business Exclusion. The court rejected the City's reliance upon HRC

---

[12] Notably, in that case this Court did not address any proposed statutory sources of express authority to impose the requirement, such as are contemplated by HRC § 2962(f).

§ 2962(c)(4), which broadly bars a municipality from enacting ordinances and regulations "with respect to definitions, sanitation, safety, health, standards of identity or labeling pertaining to the manufacture, processing, storage, distribution and sale of any foods, goods or services subject to any Commonwealth statutes and regulations" unless they are uniform with Commonwealth statutes and regulations on the same subject, but makes an exception for "ordinances relating to building codes or any other safety, sanitation or health regulations pertaining thereto." 53 Pa.C.S. § 2962(c)(4). In relying upon "ordinances relating to safety, sanitation or health regulations" as a source of express authority, the court observed, the City effectively wrote out of the statute the language limiting these allowances to ordinances "relating to building codes" and regulations "pertaining thereto." The City's argument failed because the PSDA had nothing to do with building codes.

The intermediate court also rejected the City's reliance upon the SCCC. The court did not endorse the trial court's conclusion that the SCCC could not grant the authority in question because the City had forfeited its second-class city status by electing home rule. However, the court concluded that the City's reliance upon SCCC §§ 23145 (authorizing cities to "make regulations to secure the general health of the inhabitants") and 23146 (permitting cities to "make all necessary orders and regulations to prevent the introduction of contagious or pestilential diseases into the city" and "to enact quarantine laws for that purpose") was unavailing because neither provision "expressly grant[s] the City authority to impose the affirmative duties" embodied in the PSDA. *PRLA*, 2017 WL 2153813 at *3.

With regard to the City's resort to the DPCL, the Commonwealth Court agreed with the trial court that the City's lack of a health board or health department precluded the DPCL's application. In this regard, the court summarily rejected the City's argument that

the DPCL's authorization applies where a home-rule municipality is served by a county health department. Rather, on the Commonwealth Court's account, only if the City was served by a municipal board or department of health might it find the requisite authority to provide paid sick leave. As a consequence of this reasoning, the Court did not address whether, assuming the City had the legislative authority conferred by the DPCL, the DPCL's terms would qualify as express authority for purposes of the Business Exclusion.

Judge Cosgrove was the lone dissenter. Citing the "essential principle underlying home rule [to] transfer [] authority to control certain municipal affairs from the state to the local level," *id.* at *4 (Cosgrove, J., dissenting) (quoting *Hartman v. City of Allentown*, 880 A.2d 737, 742 (Pa. Cmwlth. 2005)), Judge Cosgrove noted that this Court's decision in *BOMA—2009*, upon which the Commonwealth Court majority relied, concerned an ordinance that was designed "in the first place to *regulate* business," while the PSDA reflects an effort to protect health and safety that lies at the heart of home rule. *Id.* at *5 (citing *BOMA—2009*, 985 A.2d at 715 n.12, in which the Majority of this Court criticized the dissent for "confus[ing] *regulating* business with health or safety ordinances that may *affect* a business"). Thus, Judge Cosgrove maintained, the exercise of home-rule authority in this case should be allowed because the PSDA acts in furtherance of health and safety and the resulting burdens upon businesses are merely incidental to that objective.

In its separate decision affirming the trial court's ruling that the SSBA violated the HRC, the Commonwealth Court rejected the City's resort to the SCCC and the Emergency Code as sources of express statutory authority for purposes of the Business Exclusion. The City contended that the SSBA was authorized by: SCCC § 23145, which empowers second-class cities "[t]o make regulations to secure the general health of the inhabitants,

and to remove and prevent nuisances"; Section 25081, which authorizes second-class cities to provide for the inspection of all buildings and premises "to decrease and prevent fire, the spread of fire, and fire waste, loss of life from fire, and loss of life or damage to property from unsafe or improper construction or design"; and Section 25092, pursuant to which second-class cities may "provide for the preparation and distribution by the Department of Public Safety of rules and regulations to minimize the danger of fire and lessen fire waste."  The court found that these provisions did not grant the City "specific authority" to impose upon employers the affirmative duties that the SSBA created.

The court also found that the Emergency Code did not confer express authority to enact the SSBA.  The Emergency Code authorizes and directs political subdivisions "to establish a local emergency management organization in accordance with the plan and program of the Pennsylvania Emergency Management Agency" with "responsibility for emergency management, response and recovery within the . . . political subdivision." 35 Pa.C.S. § 7501(a).  Section 7503 directs political subdivisions to "adopt an Intergovernmental Cooperation agreement with other political subdivisions" in furtherance of maintaining a "disaster emergency management plan," and explains in great detail the various functions for which the plan must provide.  The court found that these grants of authority do not "expressly empower" the City to direct the regulation and training of "Security Officers" or "Building Service Employees" of private employers.  Acknowledging Section 7503(7)'s authorization of municipalities to "[c]ooperate and coordinate" with private employers in furtherance of the "Intergovernmental Cooperation agreement"

among cooperating municipalities, the court found that it nonetheless did not support compelled regulation and training of covered security and service employees.[13]

The City and SEIU sought our review of these decisions, which we granted in order to resolve the following question:

> Did the Commonwealth Court err in holding that the State Emergency Management Services Code, the State Disease Prevention and Control Act Law [*sic*], the Second Class City Code, and the Home Rule Charter and [Optional Plans] Law failed to satisfy the "expressly provided by statute" exception, and that the City of Pittsburgh therefore lacked the authority to pass the Paid Sick Days Act and the Safe and Secure Buildings Act?

*Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 175 A.3d 219 (Pa. 2017) (*per curiam*).

## III.  THE GOVERNING LEGAL STANDARDS

The scope of the issue we granted for review is narrow.  We consider only whether any "statute[] which [is] applicable in every part of this Commonwealth or which [is] applicable to all municipalities or to a class or classes of municipalities," 53 Pa.C.S. § 2962(f), expressly empowered the City to enact either or both of the PSDA and SSBA.

Before taking up these two ordinances in detail, we note that resolving the question presented requires us to seek express statutory authority as conceived by the Business Exclusion.  This principally constitutes an exercise in statutory construction involving a question of law, which we address *de novo*, subject to a plenary scope of review.  *Thomas Jefferson Univ. Hosp., Inc. v. Pa. Dep't of Labor & Indus.*, 162 A.3d 384, 389 (Pa. 2017). "'In all matters involving statutory interpretation, we apply the Statutory Construction Act, 1 Pa.C.S. §§ 1501, *et seq.*, which directs us to ascertain and effectuate the intent of the

---

[13]     Once again, Judge Cosgrove dissented.  In this case, he merely cited his dissent in the PSDA decision as expressing his reservations with regard to the court's rejection of the SSBA.

General Assembly. 1 Pa.C.S. § 1921(a).'" *Id.* at 389 (quoting *Commonwealth v. Kingston*, 143 A.3d 917, 922 (Pa. 2016)). In seeking the General Assembly's intent, our inquiry begins and ends with the plain language of the statute if that statute is unambiguous. *Mohamed v. Commonwealth, Dep't of Transp., Bureau of Motor Vehicles*, 40 A.3d 1186, 1193 (Pa. 2012). However, when the language is susceptible of two or more reasonable interpretations, we may rely upon various extrinsic considerations. These construction devices include, but are not limited to:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c). We also may presume that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," and that the legislature "intends to favor the public interest as against any private interest." 1 Pa.C.S. §§ 1922(1), (5).

It bears repeating that "[a]ll grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality." 53 Pa.C.S. § 2961. Accordingly, when we find ambiguity in the scope of municipal authority and limitations

imposed thereupon, we must resolve that ambiguity in the home-rule municipality's favor.

*Nutter*, 938 A.2d at 411 (quoting *Cty. of Delaware*, 511 A.2d at 813).

## IV.  DISCUSSION[14]

Disposition of these appeals turns upon the Business Exclusion and the limited exception which that provision contains.  The Business Exclusion provides as follows:

> **Regulation of business and employment.—**A municipality which adopts a home rule charter shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, *except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities. . . .*

53 Pa.C.S. § 2962(f) (emphasis added).  Accepting as we must the proposition that both the PSDA and the SSBA in some sense determine duties, responsibilities, and requirements placed upon businesses and employers, we must decide whether the impositions in question are "expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities."  *Id.*  Before taking each ordinance up individually, we must address one recurrent argument that bears upon both the PSDA and the SSBA.

---

[14]     The following *amici curiae* have filed or joined others in filing briefs in support of the City and SEIU: American Civil Liberties Union of Pennsylvania; A Better Balance and Local Government Labor Law Professors; Fifty-One Organizations Committed to Women's Health and Safety; International Association of Fire Fighters, Local 1; Pennsylvania Municipal League and Pennsylvania State Association of Township Commissioners; and Pennsylvania State Association of Township Supervisors.

Supporting Challengers are *amici curiae* the Restaurant Law Center, the National Federation of Independent Business Small Business Legal Center, the Pennsylvania Food Merchants Association, and the Pennsylvania Chamber of Business and Industry.

## A. Resort to Municipal Codes Under the Business Exclusion

The trial court, Challengers, and certain *amici curiae* maintain that the City cannot rely in any way upon the SCCC as authority for its enactment of either the PSDA or the SSBA. They contend that the City surrendered its status as a second-class city, and thus any resort to the SCCC, upon the enactment of its home-rule charter. Those venturing this interpretation cite our decision in *County of Delaware*, 511 A.2d 811, and the Commonwealth Court's decision in *Danzilli*, 944 A.2d 813. Taken at face value, the proposition is correct. Thus, in *County of Delaware*, we held that "the adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality." *Cty. of Delaware*, 511 A.2d at 813. However, that principle has no bearing on our interpretation of the Business Exclusion.

It bears repeating that our Constitution grants a home-rule municipality all powers "not denied by this Constitution, by its home rule charter or by the General Assembly at any time." PA. CONST. art. IX, § 2. Furthermore, "a home-rule municipality's exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation." *SEPTA*, 101 A.3d at 88. Thus, "[a]ll grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality." 53 Pa.C.S. § 2961. From this, it necessarily follows that a home-rule municipality power cannot, except where specified clearly by statute or the municipality's own charter, find itself vested with less power than a non-home-rule counterpart.

By its terms, the Business Exclusion allows municipal regulation of business when expressly provided "by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities." 53 Pa.C.S. § 2962(f).  It does not suggest that whatever statutory provision is relied upon must correspond (or cannot correspond) to the particular statutory status that the municipality invoking the exception wore before it adopted home rule.  Rather, in unambiguous terms, the Business Exclusion provides that a home-rule municipality seeking to invoke this exception is entitled to the benefit of affirmative grants of authority applicable to *any* class of municipality as a whole, or reflected in codes that apply to all municipalities together.  While it is true that, in other contexts, the City may not seek authority in the SCCC or any other municipal code on the basis that the authority in question is specifically conferred by that code standing alone, here it is the Business Exclusion itself that furnishes the authority in question: It merely incorporates municipal codes and state-wide regulations by reference to define the scope of the authority.

The flaw in the Challengers' reasoning appears on the face of the HRC itself.  The Business Exclusion—its prohibition as well as the exception thereto—applies *only* to home-rule municipalities.  However, the scope of the exception to the Business Exclusion is defined, in part, by reference to "statutes . . . which are applicable to all municipalities or to a class or classes of municipalities."  *Id.*  Challengers thus are wedded to one of two untenable positions: either (1) that the putative grant of authority is mere surplusage, because as home-rule municipalities, no municipalities seeking to establish authority to act under the exception to the Business Exclusion may invoke any municipal code; or (2) that a given home-rule municipality seeking the exception may cite authority in any

municipal code *except* the particular one that would apply to that municipality had it not elected home-rule in the first instance. We presume that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," and that "the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922; *see Allegheny Cty. Sportsmen's League v. Rendell*, 860 A.2d 10, 19 (Pa. 2004) (noting that, where possible, we must interpret a statute to give effect to every provision because we presume that the legislature intends to avoid mere surplusage). The first argument manifestly creates considerable surplusage, and the second is absurd on its face.

Neither *Delaware County* nor *Danzilli* are to the contrary. In *Danzilli*, the Commonwealth Court rejected resort to a municipal code as a stand-alone *limitation* on a home-rule municipality's authority, hence hewing to the bedrock proposition that a home-rule municipality enjoys all powers not denied it by the Constitution or state statute. Because Middletown Township was a home-rule municipality, the municipal code's limitations did not apply to it. *See Danzilli*, 944 A.2d at 814-16; *cf. Ziegler v. City of Reading*, 142 A.3d 119, 134 (Pa. Cmwlth. 2016) ("[A]lthough home rule cities may not be *limited or restrained* by their former municipal codes, there is no law preventing a home rule charter from exercising powers bestowed by its former code."). In *Delaware County*, we *upheld* resort to a municipal code, but only because, as in this case, the statute in question was incorporated by reference in the relevant provision of the HRC, and the action in question was not otherwise precluded by statute. *See Delaware Cty.*, 511 A.2d 811. Thus, as in this case, the source of authority was the HRC itself. The municipal code was used only to flesh out the nature and scope of that authority, as

expressly provided by the HRC provision at issue. Thus, *Danzilli* is distinguishable, and *Delaware County* contradicts Challengers' contention.

The Business Exclusion provides limited authority for certain actions, the scope of which it expands in plain language to include by reference all authority vested by any state statute pertaining to any class or all classes of municipality. This supports the City's argument that the legislature intended municipalities electing home rule to enjoy as much or more authority than municipalities that decline to do so. As worded, this exception to the broader preclusion of municipal authority to regulate business ensures that a home-rule municipality can invoke the authority that *any* municipality in the Commonwealth has been granted. Accordingly, Challengers' argument that the City can derive no authority under the SCCC is unavailing.

### B. The Paid Sick Days Act

As potential sources of express statutory authority for the PSDA, the City cites the DPCL and the SCCC. Section 521.16(c) of the DPCL provides as follows:

> Municipalities which have boards or departments of health or county departments of health may enact ordinances or issue rules and regulations relating to disease prevention and control, which are not less strict than the provisions of this act or the rules and regulations issued thereunder by the board. . . .

35 P.S. § 521.16(c). The City argues that this provides an express grant of statutory authority of the sort envisaged by the Business Exclusion.

We first must consider the disputed threshold question regarding whether we should count the City as one among the "[m]unicipalities which have boards or departments of health or county departments of health," to whom this limited grant of authority applies. Undisputedly, Pittsburgh has no municipal board or department of

health. However, Allegheny County, within which Pittsburgh lies, is served by the Allegheny County Health Department. The Commonwealth Court found, and Challengers argue, that because the City has no municipal board or department of health, our inquiry need go no farther, because the City fails to satisfy DPCL § 521.16(c)'s threshold condition.

Beyond simply arguing that the words describe municipalities that are served by *any* local department of health, whether city-specific or countywide, the City offers two additional arguments. First, it argues that its interpretation is "consistent with both the broad scope of home rule authority and municipalities' long-recognized authority to protect public health, safety, and welfare." Brief for the City at 23. Furthermore, the City argues that to read the inclusion of county boards of health in the DPCL § 521.16(c) in the restrictive way that the trial court and Challengers do would render that provision redundant with the Local Health Administration Law,[15] which authorizes county departments of health to issue "rules and regulations for the prevention of disease," 16 P.S. § 12011(c), thus rendering that aspect of DPCL § 521.16(c) duplicative with regard to county rule-making authority on the lower court's and Challengers' account. The City further argues that PRLA's interpretation leads to an absurd result because it effectively "reads 'or county departments of health' out of Section 521.16(c)." Brief for the City at 24.

Mounting what they characterize as a plain-language argument, Challengers essentially argue that the City does not fall within the Act's scope not because of what it does say, but because of what it does not say:

---

[15] Act of Aug. 24, 1951, P.L. 1304, *as amended*, 16 P.S. §§ 12001-28.

> The plain language of the statute does not authorize (as Appellants argue) municipalities *which are located in a county which has a county department of health* to promulgate health regulations. Rather, it only authorizes municipalities which ***themselves*** have boards or departments of health . . . to promulgate health regulations and counties which have departments of health to issue county-wide health regulations.

Brief for PRLA at 24 (emphasis in original). PRLA also contends that the DPCL's definitional section supports their argument, in defining "local board or department of health" as "[t]he board of health or the department of public health of a city, borough, incorporated town or township of the first class, **_or_** a county department of health, or a joint county department of health." 35 P.S. § 521.2(f) (emphasis as provided in PRLA's brief). "The definition makes a clear distinction between a board or department of health of a municipality and a county department of health," and "[t]here is no basis upon which [the City] can reasonably conflate the two in order to arrive at the contrived interpretation of Section 512.16(c) that the City has a department of health because Allegheny County indisputably does." Brief for PRLA at 24-25.

One complication confounds Challengers' interpretive approach. Specifically, ostensibly in order to account for the presence of a county department of health in the statute at all, Challengers offer that DPCL § 521.16(c) "empowers municipalities which have boards or departments of health to enact certain health-related ordinances or regulations," and *also* "empowers counties with departments of health to do so." Brief for PRLA at 25. However, the flaw in this reasoning, and hence the inferences that depend upon it, is that nowhere in Section 521.16(c) is a county, as such, empowered to do anything. If the statute does not empower the county itself to exercise the authority contemplated therein, then the reference to ordinances necessarily anticipates municipal

action, suggesting that the oversight of a county board of health suffices to vest municipal law-making authority under the DPCL.

One may reason credibly that, because Section 521.16(c) refers to the making of ordinances, and because the only entity described in the statute that has authority to enact ordinances is the City (with or without a municipal board or department of health), the legislature intended to authorize municipalities to issue ordinances in service of that section's mandate when it is served by either a municipal *or* a county board or department of health. On this reading, the City would satisfy the threshold condition.

That being said, Challengers' argument is not entirely untenable. While it would suggest imprecise draftsmanship, one might allocate the power to enact ordinances only to municipalities served by their own boards or departments of health, and recognize the presence of county departments of health to be concerned only with the rule-making authority the statute describes.

In light of these considerations, we find that the DPCL is ambiguous with regard to whether and when municipalities may enact ordinances relating to disease prevention and control. Accordingly, we must seek guidance in our rules of construction, presuming that the legislature did not intend an absurd or unreasonable result and that it intended to serve the public over private interests, and we must resolve ambiguities in favor of local regulation.

As suggested above, we find the City's account of the text more convincing than Challengers'. But that is not the only basis upon which we resolve this threshold question in the City's favor. Section 521.3 of the DPCL provides further support for the City's view of its authority. That section provides that "[l]ocal boards and departments of health shall

be primarily responsible for the prevention and control of communicable and non-communicable disease, . . . in accordance with the regulations of the [State Advisory Health Board] and subject to the supervision and guidance of the [State Department of Health]." 35 P.S. § 521.3(a) (bracketed insertions reflect the definitions provided by 35 P.S. § 521.2). It further provides that the State Department of Health "shall be responsible for the prevention and control of communicable and non-communicable disease in any municipality which is *not* served by a local board or department of health." 35 P.S. § 521.3(b) (emphasis added), implying that, where a municipality *is* served by a county department of health, the municipality in tandem with the county agency assumes responsibility for disease prevention and control.

The DPCL defines a "[l]ocal board or department of health" as "[t]he board of health or the department of public health of a city, borough, incorporated town or township of the first class, *or a county department of health*, or joint county department of health." 35 P.S. § 521.2 (emphasis added). Notably, in DPCL § 521.3(b), where the statute vests responsibility for disease prevention and control in the state board "in any municipality which is not served by a local board or department of health," it does not discriminate between a municipal board of health or a county board of health. Thus, viewed in its entirety, the DPCL embodies the General Assembly's intention that county boards or departments of health should be treated as serving the municipalities within their respective counties.[16]

---

[16] Notably, in Title 16 Chapter 4 of the Pennsylvania Statutes, which provides an exhaustive account of the existence, composition, and authority of county boards and departments of health, we find that a county's department or board of health upon its inception takes jurisdiction over "all municipalities which do not have departments or

We find in the DPCL a holistic scheme that, for purposes of disease prevention and control, favors local regulation as informed by the expertise of a dedicated local board or department of health over state-level regulation, and correspondingly allows local lawmakers to impose more stringent regulations than state law provides. Thus, in priority order, a municipality with a board or department of health may enact ordinances or promulgate rules and regulations in service of disease prevention and control. Where a municipality lacks its own board or department of health, but lies within the jurisdiction of a county department of health, the municipality may enact such ordinances, while the county board or department of health may issue rules and regulations. Absent a municipal or county board or department of health, a municipality falls within the jurisdiction of the state board.

With this account in mind, viewing DPCL § 521.16 in its entirety, certain principles are clear. First, state-level regulations must be devised and promulgated by a State Advisory Health Board with the Secretary of Health's oversight. Second, at the local level, municipalities with the benefit of access to similar expertise, whether in the form of a municipal board or department of health or a department or board administered by the county, enjoy the prerogative of enacting additional laws or regulations, provided they are no *less* strict than state law and regulations on the same subject. *See* 35 P.S. § 521.16(c) (allowing such ordinances that "are not less strict than the provisions of this act or the rules and regulations issued thereunder" by the state board). Consequently, the City, lying

---

boards of health at the time of the establishment of the county department of health," including those that, until that time, had been under the jurisdiction of the State Department of Health. 16 P.S. § 12013.

within the jurisdiction of the Allegheny County Health Department, qualifies as a municipality which has a department of health for purposes of DPCL § 521.16.

Having found that the City satisfies DPCL § 521.16(c)'s threshold requirement, we now must determine whether that section expressly authorizes the City to enact the PSDA. Challengers do not dispute that mandating paid sick leave "relat[es] to disease prevention and control."[17]  Nor do Challengers dispute that encouraging sick workers to convalesce privately will have a salutary effect on public health generally.[18]  Thus, we detect no material dispute that the PSDA is, at least in the literal sense, "an ordinance . . . relating to disease prevention and control," as envisaged by Section 521.16 of the DPCL.

This does not end our inquiry, though, because it does not conclusively establish that the DPCL's authorization is "express" with respect to the burden businesses will bear

---

[17]    The closest that Challengers come to doing so is in observing that Pittsburgh does not have "a public health code," and that the PSDA, instead, appears in Title VI of the Code, governing "Conduct," which "contains ordinances concerning diverse matters such as panhandling, curfew, boating, firearms, youth offender work corps, weeds and grass, alarm systems, . . . Marcellus shale drilling, . . , and other topics."  Brief for PRLA at 21-22.  Thus, in Challengers' view, it is improper to treat the PSDA as a "health regulation," because it is, in fact, a "labor and employment ordinance."  But how the ordinance is classified, and what motives one might impute to the City in enacting it, do not amount to a direct challenge to the proposition that paid sick leave discourages what one *amicus curiae* identifies as "presenteeism," reporting to the workplace while ill, and that presenteeism for want of paid sick leave exacerbates the spread of contagious disease. *See generally* Brief for *Amici Curiae* Fifty-One Organizations Committed to Women's Health and Safety.

[18]    *Amici Curiae* provide detailed accounts of the research sustaining the proposition that paid leave policies have a salutary effect on public health.  *See* Brief *Amici Curiae* Fifty-One Organizations Committed to Women's Health and Safety at 4-14; Brief *Amici Curiae* Pa. Mun. League and Pa. State Ass'n of Twp. Comm'rs at 20-22.  However, we do not need to consult with experts to find that the City's expectation that allowing paid sick leave will reduce the greater community's exposure to contagion is a reasonable basis, in itself, for the PSDA.

in facilitating the implementation of the PSDA, as that word is employed in the Business Exclusion. Challengers' position distills to the proposition that, to burden business, the "express" exception applies only where the General Assembly has anticipated, described, and explicitly authorized municipalities to burden businesses in the particular way proposed. Challengers would have us require that the DPCL or other related statute not only authorize a municipality to legislate generally for purposes of disease prevention and control, but also indicate with particularity that the municipality may do so even where it would burden employers, and perhaps, even more finely, that it may do so by dictating paid leave policies. In effect, the parties' respective positions depend on how *specific* the "express" authorization must be.

Here, we recall, the language at issue precludes such regulation "*except as expressly provided by statutes.*" Our research discloses no Pennsylvania statute that utilizes precisely that language, and we find little guidance in case law under the Business Exclusion or otherwise where the specificity necessary to establish express authority has been addressed.[19] The DPCL authorizes in unmistakable terms the enactment of local

---

[19]    In an effort to fill this void, Chief Justice Saylor cites only one binding authority, arguing that, in *Commonwealth v. Beam*, 788 A.2d 357 (Pa. 2002), we "equat[ed] 'express legislative delegation' with 'legislative language that is clear and unmistakable.'" *See* Conc. & Diss. Op. at 6-7 (Saylor, C.J.). Thus, like Challengers, the Chief Justice would demand authority that is not only "clear" and "unmistakable" but also "*specific . . . and not left to inference or implication,*" a new requirement he would add onto *Beam*'s formulation. *Id.* (emphasis added). *Beam*'s "clear and unmistakable" language, however, must be understood against the backdrop of the administrative context in which it lies; to wit, this Court's careful scrutiny of putative legislative grants of administrative authority, which arises from our wariness of the improper or unintended delegation of legislative authority to unelected administrative officials. *See generally Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827 (Pa. 2017). The effect of our holding in *Beam* is that any ambiguity regarding the asserted delegation must be construed against the delegation. Conversely, the Pennsylvania Constitution provides that "[a] municipality

which has a home rule charter *may exercise any power or perform any function not denied* by this Constitution, by its home rule charter or by the General Assembly." PA. CONST. art. IX § 2 (emphasis added). This is complemented by our statutorily prescribed presumption in favor of local authority when we confront ambiguity in an alleged legislative prohibition of home-rule authority. 53 Pa.C.S. § 2961 ("All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality."); *accord Nutter,* 938 A.2d at 411 (holding that ambiguity in the scope of a home-rule municipality's authority and the limitations imposed upon such authority must be resolved in the municipality's favor). The "specific, clear and unmistakable standard" that the Chief Justice proposes would reverse this time-honored principle of construction, and would instead presume that ambiguity arising from a lack of specificity must be resolved *against* local authority.

Moreover, the Chief Justice's view excludes the possibility that a grant of authority can be express in its general terms while nonetheless ambiguous regarding the particular incidents that the authority might permissibly encompass. To use the Chief Justice's own terminology, it cannot seriously be disputed that the DPCL "specifically, clearly, and unmistakably" authorizes municipalities to regulate to prevent and control disease. But what, precisely, qualifies as such a regulation and what such a regulation may require of any given party or class of parties is unspecified. Notably, even in *Beam* we recognized the necessity of "implied [administrative] powers" precisely because, "as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency." *Beam*, 788 A.2d at 360 (quoting 2 AM.JUR.2D ADMINISTRATIVE LAW § 62 (1994)); *cf. id.* at 361 (holding, in the administrative context, that "the delegation of authority to an agency is construed liberally when the agency is concerned with protecting the public's health and welfare"). The Chief Justice's rejection of the exercise of any powers discernible only by "inference or implication," Conc. & Diss. Op. at 6, contradicts *Beam*'s acknowledgment that the legislature may, in conferring "clear and unmistakable"—but nonetheless broad—statutory authority to regulate in a given domain, constructively confer textually unspecified powers upon agencies that are necessary to exercise a "clear and unmistakable" delegation of authority. Similarly, in granting broadly-described legislative authority upon home-rule municipalities to enact measures to prevent and control disease, the General Assembly must have anticipated unspecified measures necessary to give life to the authorization. This observation certainly does not exclude reasonable dispute regarding whether the incidental burdens that the PSDA imposes upon employers exceed what the exception to the Business Exclusion allows, and the Dissenters' position on this point is not unreasonable, as far as it goes. But it is precisely our reasonable disagreement regarding the breadth of the authority expressly granted by the DPCL that reveals the ambiguity that we must resolve in the City's favor. *See Nutter*, 938 A.2d at 411.

legislation in furtherance of disease control and prevention. But whether and to what extent that allows the consequent burdening of businesses remains an open question.

The courts below and the parties have discussed a number of cases, and these warrant brief discussion. The parties chiefly address *BOMA—2009*, *supra* (finding that an ordinance requiring contracting concerns newly retained by the City to retain the former contractors' employees for 180 days violated the Business Exclusion), but also refer to *Hartman*, 880 A.2d 737 (finding that anti-discrimination ordinance did not violate the Business Exclusion), and *Smaller Manufacturers Council v. Council of the City of Pittsburgh*, 485 A.2d 73 (Pa. Cmwlth. 1984) (finding that an ordinance obliging businesses to provide notices in advance of certain plant relocations, closures, or reductions in workforce violated predecessor provision substantially identical to the Business Exclusion). The problem we encounter, though, is that in none of these cases did the reviewing court specifically consider or address other statutes identified as providing the express authority that triggers an exception to the Business Exclusion. Thus, we have no guidance on that question, which is essential to this case.

Nonetheless, *BOMA—2009* suggested a legal rubric, relied upon by the Commonwealth Court and Challengers, that we must address. *BOMA—2009* distinguished *Hartman*, and held that "Section 2962(f) prohibits the placement of affirmative duties on employers such as those imposed by the Ordinance herein," *BOMA—2009*, 985 A.2d at 716, a provision which, as set forth above, involved the mandatory retention by new contractors of the employees of the contractors they replaced for a period of 180 days. *Cf. Smaller Manufacturers*, *supra* (invalidating provision that directed companies to provide the city with notice of certain planned business moves that would

affect local employment).  Challengers argue that the PSDA imposes an "affirmative" obligation upon businesses and employers in allowing and administering paid sick leave, as well as in requiring them to compensate employees for time during which they are absent pursuant to the mandatory policy.  *BOMA—2009*'s language suggests a bright-line rule, to be sure, but a parenthetical qualification in that same opinion complicates matters.

Justice Todd dissented in *BOMA—2009*, contending that the majority's approach effectively denied home-rule municipalities powers undisputedly enjoyed by non-home-rule municipalities, contradicting the legislature's intent to grant home-rule municipalities as much or more authority than their non-home-rule counterparts.  *BOMA—2009*, 985 A.2d at 716 (Todd, J., dissenting) ("[T]he undisputed intent of the General Assembly was for municipalities which have adopted home rule to enjoy . . . broader powers of self-government than non-home rule municipalities.").  Justice Todd suggested that the majority "engraft[ed] onto the statute a distinction between affirmative and non-affirmative duties that is not found there, and that is impossible to reconcile with the plain language of the statute."  *Id.*  Conversely, settled precedent established that non-home-rule municipalities, which are not bound by the Business Exclusion, were allowed to regulate businesses as an exercise of their "general welfare" or police powers.  *Id.* at 717-18 (citing *Taylor v. Harmony Twp. Bd. of Comm'rs*, 851 A.2d 1020, 1024-25 (Pa. Cmwlth. 2004)).  For example, in *Taylor*, the Commonwealth Court upheld an ordinance that barred timber harvesting in certain areas deemed unstable or flood-prone as a proper exercise of a township's police powers.  The majority's response to the dissent's citation of *Taylor* was telling: "[T]he dissent confuses regulating business with health or safety ordinances that may affect a business."  *Id.* at 715 n.12.

Measuring the *BOMA—2009* Majority's distinction against the facts in that case and those in *Taylor* reveals that the line between what constitutes an affirmative obligation and a non-affirmative obligation is not as clear as one might suppose. After all, in denying logging companies the right to timber portions of land on which they had such rights seems to reflect the imposition of an affirmative burden—to avoid logging in the designated areas.[20] Moreover, in implicitly classifying the *Taylor* scenario as a "health or safety ordinance[] that may affect a business," the *BOMA—2009* Majority left the door open to ordinances that impose incidental burdens in service of the general welfare.

By itself, the concept of express authority, when measured against the potential complexity of acting upon it when it is broadly-stated, proves imprecise, and introducing a distinction between affirmative burdens (telling businesses what to do) and non-affirmative burdens (telling businesses what they may not do) only complicates the matter. Thus, once again, we must seek guidance in our rules of construction.

The object of the DPCL, plainly, is disease prevention and control. The object of the Business Exclusion is to avoid regulations that burden commercial interests absent express authorization, with attendant concern for the imposition of inconsistent requirements from one municipality to the next. However, were we to accept Challengers' definition of "express," we would hamstring home-rule municipalities from exercising their home-rule authority in any way that burdens businesses, even where such burdens are

---

[20]     This do/not-do distinction putatively accounts for the Commonwealth Court's decision in *Hartman*, wherein the Commonwealth Court upheld an anti-discrimination ordinance against a Business Exclusion challenge on the basis that the ordinance did not require covered parties to *do* anything, only to refrain from discrimination in prescribed contexts.

incidental or *de minimis*, and certainly in a case such as *Taylor*, which, as informed by *BOMA—2009*, would be abrogated by such a broad account. It is unrealistic to expect the General Assembly to draft statutes providing the sort of surpassing specificity PRLA would demand, because it is impossible for any legislature to anticipate the innumerable ways in which any given ordinance might affect a given business's receipts or complicate its administration.

Conversely, it is not unreasonable to anticipate that, when the legislature authorizes municipalities to enact ordinances, rules, or regulations in furtherance of disease prevention and control, it recognizes that such an authorization is not self-executing, and may entail action that burdens businesses in any number of ways, both foreseeable and unforeseeable. Hence the ambiguity driving the instant controversy. Consequently, we must consider the fact that the General Assembly did not more precisely cabin the legislative and regulatory authority it expressly granted municipalities in the DPCL in light of our obligation to construe ambiguous statutes in favor of the public interest over private interests, and in favor of local authority over state authority.

The burden the PSDA presents to businesses is not insignificant. The ordinance nonetheless bears a direct nexus with public health, and, all things being equal, lies squarely within both the City's traditional police powers and the ambit of the DPCL. Consequently, the PSDA is more like a "health or safety ordinance[]" that affects business than a statute with its principal focus upon regulating business for its own sake, as we conceived that distinction in *BOMA—2009*. For this reason, we find the DPCL's legislative authorization to municipalities to "enact ordinances . . . relating to disease prevention and control" such as the PSDA sufficiently clear to satisfy the limited exception to the Business

Exclusion.  Accordingly, we hold that the City did not exceed its home-rule authority in enacting the PSDA.  The Commonwealth Court erred in concluding otherwise.[21]

### C.  The Safe and Secure Buildings Act

The SSBA imposes numerous complex and continuing obligations upon owners and employees of "covered properties,"[22]  all in service of the following purpose:

> [T]o enhance the safety requirements and standards currently in the Emergency Management and Preparedness Chapter of the Fire Prevention Code for the benefit of the public by ensuring that buildings are staffed with workers who receive the training necessary to protect its occupants and property. . . .
>
> A prohibition on an untrained workforce . . . will ensure that security officers and other building service workers are trained in a range of essential skills, including counterterrorism, crime prevention, fire and other building safety, disaster recovery, first aid, and coordination with police, fire, and emergency personnel during an emergency.

SSBA § 410.02.

Under the SSBA, within 180 days of its enactment for current employees, and within sixty days of hiring for new employees thereafter, covered security officers[23] must receive

---

[21]     Because we find authority to enact the PSDA in the DPCL, we need not consider or further discuss the City's proposed reliance upon other statutory grants of authority.

[22]     "Covered properties" are defined as: commercial office buildings or complexes; retail buildings or complexes; health care facilities; and museums and "similar cultural institutions" occupying more than 100,000 square feet.  Additional covered properties include colleges and universities, as well as "[p]roperties owned, managed or occupied, at least in part, by the City."  SSBA § 410.03(d).

[23]     "Security officer" is defined as: "a person employed principally to perform one (1) or more of the following functions: protection of individuals or property from harm or unlawful or unauthorized activity; and deterrence, observation, detection and/or reporting of incidents in order to prevent or abate any harmful, unlawful or unauthorized activity, but shall exclude City, County, State and Federal law enforcement officers, or any law enforcement officer pursuant to 22 Pa.C.S.A. section 501."  SSBA § 410.03(e).

a minimum of forty hours of training and annual refreshers of at least eight hours on the following topics:

    a. The covered property's all hazard plan;

    b. Role of the security officer: how to identify specific response methods to emergency situations which are consistent with the security officer role and function;

    c. Legal powers and limitations of the security officer, such as:

        1. Laws and liability;

        2. Identifying the types of crimes that may be encountered on specific work sites;

        3. Evidence preservation;

        4. Explaining the justification of use of force, including deadly physical force, by a security officer/private citizen; and

        5. Identifying the security officer's arrest authority and limitations in the workplace.

    d. Emergency situations and response procedures: appropriate prevention and response methods to emergencies including fire, chemical spills, terrorist threats, workplace violence, medical emergencies, biohazards, and natural disasters, including evacuation and disaster recovery;

    e. CPR protocol and how to use medical equipment, including defibrillators;

    f. Terrorism related topics: developing observation, detection and reporting skills, and improving skills in working with advanced security technology including surveillance and access control procedures;

    g. Coordinating and communicating with local police, fire and emergency services;

    h. Crime, including theft prevention;

    i. Safeguarding information;

    j. Ethics;

    k. Access control: identifying proper forms of identification that are acceptable for gaining access at the location, identifying types of

physical threats that may be encountered at the location, crowd control, electronic security systems, and access control procedures; and

l. Other miscellaneous topics as determined by the Fire Bureau to be relevant such as professional image, effective communication, including communicating with clients, and report writing.

SSBA § 410.04(a)(1). Employers are required by the SSBA to provide fifteen initial hours of training and a refresher course of unspecified duration on a triannual basis to building service employees[24] in the subjects specified in paragraphs a., d., e., f., and g. of Section 410.04(a)(1). *See* SSBA § 410.04(b). The SSBA also specifies that certain "joint training" must be conducted with both security officers and building service employees. *See* SSBA § 410.04(c). The SSBA further imposes certification requirements for training schools and instructors, to be overseen by the Fire Bureau, which is responsible for the implementation and enforcement of the SSBA. *See* SSBA §§ 410.05, 410.07(a), 410.08.

As statutory authority for the SSBA, the City cites HRC §§ 2961 and 2962(c)(4), the Emergency Code, 35 Pa.C.S. §§ 7501-7931 and 79a01-79a31; and the SCCC, 53 P.S. § 25092. *See* SSBA § 410.02. None of these proposed sources of authority satisfy the exception to the Business Exclusion.

Section 25092 of the SCCC, under Building Regulations, authorizes municipalities "[t]o provide for the preparation and distribution by the Department of Public Safety of rules and regulations to minimize the danger of fire and lessen fire waste." 53 P.S. § 25092.

---

[24] "Building service employee" is defined as: "a person performing work in connection with the care and maintenance of property, such as a concierge, doorperson, cleaner, janitor, custodian, superintendent, porter, maintenance person, handyperson, and who regularly works at such property a minimum of sixteen (16) hours per week. Except it should not include students at a college or university that are also employed directly by that college or university." SSBA § 410.03(a).

Relatedly, Section 25081 allows for "the inspection of the inside and outside of all buildings and premises at any time" "in order to decrease and prevent fire, the spread of fire, and fire waste, loss of life from fire, and loss of life or damage to property from unsafe or improper construction or design." 53 P.S. § 25081. While the SSBA delegates certain tasks to Pittsburgh's Fire Bureau, it is clear that we are confronted not with "rules and regulations to minimize" fire and fire waste that were prepared and distributed by the Department of Public Safety, but rather with an ordinance enacted by the City. Furthermore, while some of the SSBA's education requirements may reduce the danger of fire and lessen fire waste, this is not a core function of the SSBA.

This is problematic because these two sections appear in an Article of the SCCC covering "Fire Prevention" and by their terms apply only to fire-related concerns. However, fire-related concerns, even on a generous account, comprise only one small aspect of the disaster-preparedness matters embraced by the SSBA, and even that much is detectable primarily by inference. It is true that the SSBA purports to confer rule-making authority and oversight for SSBA compliance upon the Fire Bureau, but not necessarily in connection with its specific fire prevention function. Indeed, the very word "fire" does not appear until paragraph d. of SSBA § 410.04(a)(1), where it is but one in a long list of "emergencies" that includes everything from natural disasters to terrorist threats and workplace violence. The Fire Bureau is tasked with prescribing for education purposes "[o]ther miscellaneous topics as determined by the [b]ureau to be relevant," but the list of examples that follows has no direct relevance to fire prevention. Even if one could shoehorn in the proposition that extensive continuing education and training requirements covering mostly crime prevention and detection and disaster management qualify as "rules

and regulations" as those terms are used in Section 25092, such rules and regulations specifically must concern "minimiz[ing] the danger of fire and lessen[ing] fire waste." We find in the SSBA no suggestion that these particular matters are more than ancillary to the many subjects encompassed by the education and training requirements.

The City also cites SCCC Sections 23145 (authorizing a second-class city "[t]o make regulations to secure the general health of the inhabitants, and to remove and prevent nuisances") and 23158 ("[t]o make all such ordinances, by-laws, rules and regulations . . . as may be expedient or necessary . . . for the proper management, care and control of the city and its finances, and the maintenance of the peace, good government and welfare of the city, and its trade, commerce and manufactures"). While we have rejected the proposition that the "express authorization" precludes any generality whatsoever, we certainly do not suggest that what amounts to a broad account of traditional police powers constitutes "express" authorization for purposes of the Business Exclusion exception. Were we to do so, the exception would devour the rule quite completely. Sections 23145 and 23158 amount to a general warrant to legislate in service of the general health and welfare, which lies within a home-rule municipality's powers absent any statutory prohibition. Here, however, the Business Exclusion furnishes such a prohibition. Consequently, the City's resort to the SCCC fails.

Turning to the HRC provisions that the City invokes, Section 2961, as set forth above, generically provides that a home-rule municipality "may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter." Thus, it is non-responsive to *whether* the exercise of power embodied

in the SSBA is denied by the Business Exclusion. That leaves HRC § 2962(c)(4), which provides:

> [A municipality shall not e]nact or promulgate any ordinance or regulation with respect to definitions, sanitation, safety, health, standards of identity or labeling pertaining to the manufacture, processing, storage, distribution and sale of any foods, goods or services subject to any Commonwealth statutes and regulations unless the municipal ordinance or regulation is uniform in all respects with the Commonwealth statutes and regulations thereunder. This paragraph does not affect the power of any municipality to enact and enforce ordinances relating to building codes or any other safety, sanitation or health regulation pertaining thereto.

53 Pa.C.S. § 2962(c)(4). The City relies upon the last sentence's reference to the power "to enact and enforce ordinances relating to building codes or any other safety, sanitation or health regulation," but provides no account of the function of the "pertaining thereto" qualification that closes the sentence. The statute pertains essentially to building codes, and it seems clear that the catch-all language concerning *other* safety, sanitation, or health regulations intends only those that have some connection to the subject matter addressed by building codes. For example, while the building code may specify general provisions pertaining to sanitation facilities, the implication would be that the City may also enact ordinances imposing more detailed sanitation-related requirements upon building owners. That is a far cry from authorizing staff education and training requirements in subjects with little or no connection to building codes generally.

Notably, as set forth above, it is the Fire Bureau that is vested with rule-making and oversight authority over SSBA compliance, not the Department of Permits, Licenses, and Inspections, which oversees building code compliance. The City fails even to identify an attenuated connection between the SSBA and building codes. Consequently, Section 2962(c)(4) does not provide express authorization for the SSBA.

Finally, the City argues broadly that the Emergency Code authorizes the SSBA. The Emergency Code directs political subdivisions to establish "a local emergency management organization in accordance with the plan and program of the Pennsylvania Emergency Management Agency," which will take responsibility for "emergency management, response and recovery within the territorial limits of the political subdivision." 35 Pa.C.S. § 7501(a). It further provides that each political subdivision must adopt an "Intergovernmental Cooperation agreement with other political subdivisions." 35 Pa.C.S. § 7503. Cooperating subdivisions must maintain emergency management plans "for the prevention and minimization of injury and damage caused by disaster, prompt and effective response to disaster and disaster emergency relief and recovery," "[e]stablish, equip, and staff an emergency operations center," "provide individual and organizational training programs" in furtherance of its duties, and "[c]ooperate and coordinate with any public and private agency or entity in achieving any purpose of this part." 35 Pa.C.S. § 7503(1)-(3), (7).

"Pursuant to this express statutory grant," the City asserts, it "has the authority to ensure that security officers and others responsible for the operations of large buildings are trained to effectively respond during emergencies," noting that these workers "are often on the front lines during emergencies, . . . and any effective emergency management plan must integrate private security and other office building staff with government first responders." Brief for the City at 26. The City maintains that the SSBA is in service of the City's statutory obligation to adopt an Intergovernmental Cooperation agreement that enables the parties to the agreement to "[p]repare, maintain and keep a current emergency management plan." 35 Pa.C.S. § 7503(1). The City also cites the "purpose" section of the Emergency Code, which seeks to "[c]larify and strengthen the roles of . . . local government in prevention of, preparation for, response to and recovery from disasters,"

35 Pa.C.S. § 7103(4); "[a]ssist in prevention of disaster caused or aggravated by inadequate planning for and regulation of public and private facilities and land use," 35 Pa.C.S. § 7103(8); and "[f]urther programs of education and training," 35 Pa.C.S. § 7103(11).

The City's argument here is heavy on quotation but comparatively light on analysis. Sections 7501 and 7503 refer specifically to Intergovernmental Cooperation agreements. While the Emergency Code does allude to training, in context it is difficult to conclude that the legislature intended this as an express grant of authority to impose any training programs upon any private employers and any private employees that a municipality can tenuously connect to disaster preparedness. Rather, the provision requiring training immediately follows the statutory obligation to "[e]stablish, equip and staff an emergency operations center," strongly suggesting that the organizational training programs apply to: the emergency operations center itself; perhaps to the first responders who furnish the "disaster emergency services" for which Section 7503(3) provides; and, even more remotely, the "locally available manpower . . . necessary for disaster emergency readiness, response and recovery." 35 Pa.C.S. §§ 7503(2)-(4). Nothing about this statutory language suggests that it can support imposing broad obligations upon virtually all private building staff, from security to custodial. Moreover, the SSBA itself suggests no nexus with any extant or anticipated intergovernmental cooperation agreement. Thus, whatever is authorized in furtherance of intergovernmental cooperation, the SSBA by its terms does not contribute to that function.

It is one thing to say that the Commonwealth intends that local municipalities have an obligation to respond effectively to disasters and should plan for same. It is quite another to establish a grant of authority that is in derogation of the Business Exclusion. We find nothing express or implicit in the Emergency Code to sustain the SSBA.

Accordingly, we affirm the Commonwealth Court's determination that the SSBA is barred by the Business Exclusion.[25]

## V. CONCLUSION

What constitutes an express grant of authority to "determine duties, responsibilities or requirements placed upon businesses, occupations and employers" is a vexing question. If we interpret the word "express" too stringently, virtually any incidental burden upon employers arising from a local ordinance will be barred. If we interpret it too broadly, we subvert the General Assembly's manifest intent to limit the burdens that a home-rule municipality can impose upon businesses. Thus, we must find a middle ground.

---

[25] Reinforcing our analysis somewhat, we find it telling that, in its reply brief, the City proposes an alternative interpretation of the Business Exclusion to support its authority under the PSDA. The City suggests that, in generally prohibiting the determination of "duties, responsibilities or requirements *placed upon* business, occupations and employers," the General Assembly intended to preclude only local ordinances and regulations that so determine on subjects that *are already* subject to state regulation. The City makes much of the past-tense "placed upon," contending that it necessarily refers to "pre-existing duties" that "have already been imposed from somewhere other than local government." Reply Brief for City at 7. The City proceeds to suggest that its reading of this language squares with the "exception to the exception," allowing regulation where expressly authorized by statute. This is so, according to the City, because "[i]f the General Assembly has 'placed upon' businesses, occupations, and employers 'duties, responsibilities, and requirements,' the municipality cannot 'determine' those same issues unless it has express authority from the General Assembly through some other means." *Id.* at 8. In effect, the City posits, the Business Exclusion operates as a non-interference provision: Where the Commonwealth has not legislated, home-rule municipalities may do so. According to this view, because the General Assembly has yet to legislate on the subject of mandatory paid leave, it follows that home-rule municipalities like the City are free to do so.

Notably, the City does not suggest that this interpretation provides support for its authority to enact the SSBA. As our analysis of the SSBA's validity makes clear, however, the General Assembly *has* legislated on the subject of disaster preparedness, including provisions regarding staffing and education of first responders and individuals retained to staff emergency response facilities. Thus, the City's own proposed "alternative" interpretation of the Business Exclusion in support of the PSDA somewhat undermines its arguments in support of the SSBA.

Even if this case does not pronounce the ever-elusive bright-line rule, it enables us to bracket the gray area between what is and is not allowed by the limitations upon business regulation imposed by the Business Exclusion. While the PSDA certainly burdens Pittsburgh employers, it clearly falls within the ambit of the City's express statutory authority to legislate in furtherance of disease control and prevention.

Conversely, the City fails to identify any statutory authority sufficient to sustain the SSBA. While the training that the SSBA mandates may well have a salutary public effect in disaster management, the measure's multifarious provisions simply want for any statutory authority, express or otherwise. For owners and operators of qualifying facilities, maintaining and securing those facilities is a major, if not principal, function, and the definitions of "security officer" and "building service employee," *see supra* nn. 23, 24, are sufficiently broad to capture, at least as to some properties, virtually every individual employed by the building's management. For the foregoing reasons, we must conclude that no statutory provision cited by the City comes close to authorizing such requirements. Accordingly, we affirm the Commonwealth Court's ruling that the SSBA is invalid for want of express authority under the Business Exclusion.

For the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this Opinion.

Justices Todd and Donohue join the opinion in full, and Chief Justice Saylor and Justices Baer, Dougherty and Mundy join Parts I, II, and III. With regard to Part IV, each subsection enjoys majority support. In addition to the joinders of Justices Todd and Donohue, Justice Dougherty joins Parts IV(A) and (B), and Chief Justice Saylor and Justices Baer and Mundy join Part IV(C). In terms of the mandate, the disposition as concerns the PSDA is joined by Justices Todd, Donohue, and Dougherty, and the

disposition as concerns the SSBA is joined by Chief Justice Saylor and Justices Baer, Todd, Donohue and Mundy.

Chief Justice Saylor files a concurring and dissenting opinion in which Justices Baer and Mundy join.

Justice Baer files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Mundy join.

Justice Dougherty files a concurring and dissenting opinion.