**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| APARTMENT ASSOCIATION OF METROPOLITAN PITTSBURGH, INC., | : | No. 26 WAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court entered |
| | : | March 12, 2020 at No. 528 CD 2018, |
| | : | affirming the Order of the Court of |
| v. | : | Common Pleas of Allegheny County |
| | : | entered March 13, 2018 at No. GD- |
| | : | 16-000596. |
| THE CITY OF PITTSBURGH, | : | |
| | : | ARGUED: April 13, 2021 |
| Appellant | : | |

## OPINION

**JUSTICE WECHT**                    **DECIDED: OCTOBER 21, 2021**

Drawing fine lines in loose sand is among this Court's principal functions. In *Pennsylvania Restaurant & Lodging Association v. City of Pittsburgh*,[1] we were invited to draw just such a line, locating each of two Pittsburgh ordinances on the correct side of it. The line in question separates the Commonwealth's interest in honoring home rule[2] for

---

[1]    211 A.3d 810 (Pa. 2019) (hereinafter, "*PRLA*").

[2]    Home rule derives from the Pennsylvania Constitution, which provides in relevant part:

Municipalities shall have the right and power to frame and adopt home rule charters. . . . A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

those municipalities that avail themselves of it from the General Assembly's countervailing effort to limit home-rule impositions upon business.[3]  This Court held that the City of Pittsburgh's Paid Sick Days Act ("Sick Days Act") fell within home-rule authority, while the Safe and Secure Buildings Act ("Buildings Act") exceeded that authority.  In explaining our ruling, we acknowledged the difficulty of drawing a sharp line in this area, where there are as many permutations of the inquiry as there are ordinances that might be crafted.[4]  In finding that one ordinance passed muster while the other did not, we "bracket[ed] the gray area between what is and is not allowed by the limitations upon business regulation imposed by the [HRC's] Business Exclusion."[5]  But the gray area remains.  Now we consider yet another variation.

Here, we hold that the HRC's Business Exclusion precludes a Pittsburgh ordinance that proscribes source-of-income discrimination in various housing-related contexts.  Accordingly, we affirm the order of the Commonwealth Court, which reached the same conclusion.

---

PA. CONST. art. IX, § 2.  The General Assembly codified and circumscribed this authority in the Home Rule Charter and Optional Plans Law, Act of Dec. 19, 1996, P.L. 1158, No. 177, *codified as amended at* 53 Pa.C.S. §§ 2901-3171 (hereinafter "the HRC").

[3]      *See* 53 Pa.C.S. § 2962(f) ("Regulation of business and employment") (hereinafter the "Business Exclusion").

[4]      *Cf. PRLA*, 211 A.3d at 832 ("[I]t is impossible for any legislature to anticipate the innumerable ways in which any given ordinance might affect a given business's receipts or complicate its administration.").

[5]      *Id.* at 837.

In 2015, Pittsburgh City Council passed Ordinance 2015-2062,[6] the purpose of which it described as follows:

> [I]n many housing markets, one of the key ways housing is provided to low-income tenants living on Social Security, disability retirement, income assistance, or other similar forms of income is through a housing subsidy, the most well-known of which is the Housing Choice Voucher Program (also referred to as the "Section 8" voucher program)[.]

> [V]oucher holders often face blatant discrimination when searching for housing.  According to the Housing Authority of the City of Pittsburgh, 41% of low-income people who were issued vouchers had to return them unused, in part due to landlords unwilling to accept them[.]

> [D]iscrimination against voucher holders, in many cases, is a pretext for illegal discrimination based on race, national origin and familial status[.]

> [I]ndividuals seeking to use housing choice vouchers are often limited to housing in low income neighborhoods, which contributes to the clustering of housing choice tenants that violates the program's goal of providing economically mixed housing, with an analysis of data from the Housing Authority of the City of Pittsburgh revealing most housing choice units in Pittsburgh located in high-poverty, majority-minority neighborhoods[.]

> [T]he City's Fair Housing law makes it illegal to discriminate based on race, color, religion, ancestry, national origin, place of birth, sex, sexual orientation, familial status, handicap or disability or use of support animals because of the handicap or disability of the user, [but] it does not protect people based on the "source of income" they will use to pay rent.  This loophole leaves many voucher-holders vulnerable to discriminatory practices[.]

> [S]ource of income discrimination makes it increasingly difficult for voucher recipients to actually use their vouchers[.]

---

[6] The full title of the ordinance is "Ordinance supplementing the Pittsburgh Code of Ordinances, Title Six: Conduct, Article Five: Discrimination, Chapter 659: Unlawful Practices, Section 659.03: Unlawful Housing Practices by adding a new protected class, 'Source of Income.'"  Hereinafter, we primarily refer to the package of provisions this Ordinance comprised as the "Nondiscrimination Ordinance" or "the Ordinance."

[T]he City of Pittsburgh has a direct interest in ensuring that voucher holders can use their vouchers within the City of Pittsburgh.[7]

The Ordinance supplemented Section 659.03 of the Pittsburgh Code of Ordinances, which already barred various forms of discrimination in housing. First, it added a definition for "Source of Income": "All lawful sources of income or rental assistance program, including, but not limited to, earned income, child support, alimony, insurance and pension proceeds, and all forms of public assistance including federal, state and local housing assistance programs. This includes the Section 8 Housing Choice Voucher Program."[8] The remaining changes mainly involved the addition of the phrase "source of income" to other classes of individuals already protected against housing-related discrimination throughout Section 659.03's lengthy enumeration of "unlawful housing practices."[9]

In early 2016, the Apartment Association of Metropolitan Pittsburgh ("the Association"), a nonprofit corporation comprising over 200 residential property owners, managers, and landlords, filed in the Allegheny County Court of Common Pleas a Complaint for Equitable Relief and Request for Declaratory Judgment against the City, alleging that the Nondiscrimination Ordinance violated the HRC and the Pennsylvania

---

[7] Pittsburgh Ordinance 2015-2062. For readability, this introduction has been stripped of the word "WHEREAS" and end-of-clause conjunctions.

[8] PITTSBURGH PA. CODE § 651.04(jj). Section 8 draws its name from chapter 8 of the United States Housing Act of 1937, and appears at 42 U.S.C. §§ 1437, *et seq.*

[9] A detailed recitation of these provisions is unnecessary, but more thorough reproductions may be found in the Commonwealth Court's decision. *See Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*, 228 A.3d 960, 963, 973-74 (Pa. Cmwlth. 2020).

Constitution. The Association also sought a temporary stay of enforcement of the Ordinance, which the court granted. The parties submitted Stipulations of Fact and submitted the case for judgment on the pleadings (the City) or summary judgment (the Association). The trial court heard argument, and ultimately ruled in favor of the Association, declaring the Ordinance invalid.[10]

To contextualize the trial court's analysis, we begin by reviewing the home rule-related provisions essential to this case, beginning with the powers generally granted to home-rule municipalities:

> A municipality which has adopted a home rule charter may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter. All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.[11]

As we explained in *PRLA*:

> [T]he HRC extends home-rule authority only to "functions not denied by the Constitution of Pennsylvania, by statute or by [the municipality's] home rule charter." 53 Pa.C.S. § 2961. Thus, no home rule charter may confer upon a home-rule municipality "power or authority" that is "contrary to or in limitation or enlargement of powers granted by statutes which are applicable to a class or classes of municipalities." 53 Pa.C.S. § 2962(a). Notwithstanding these limitations, a home-rule municipality's exercise of legislative power is presumed valid, absent a specific constitutional or statutory limitation. The HRC instructs that "[a]ll grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality." 63 Pa.C.S. § 2961 . . . .
>
> Home rule incorporates and reinforces local municipalities' traditional police powers.

---

[10] *See Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*, GD 16-000596, 2018 WL 10140300 (C.P. Allegheny Cnty. March 14, 2018).

[11] 53 Pa.C.S. § 2961.

* * * *

The police power is one of the most essential powers of government. It has been variously defined as the power to promote the public health, morals or safety and the general well-being of the community, or as the inherent power of a body politic to enact and enforce laws for the promotion of the general welfare, or as a power extending to all the great public needs. The police power . . . enables civil society to respond in an appropriate and effective fashion to changing political, economic, and social circumstances, and thus to maintain its vitality and order.[12]

The question we confronted in *PRLA*, which we face again now, is whether a statute "denies"—in the wording of Section 2961—Pittsburgh the authority to enact a given ordinance. Specifically at issue is the HRC's Business Exclusion, which provides:

**(f) Regulation of business and employment.—**A municipality which adopts a home rule charter shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities. . . .[13]

In a tangible sense, the Nondiscrimination Ordinance indisputably "determine[s] the duties, responsibilities, [and] requirements placed upon [Pittsburgh] businesses" engaged in providing housing and residential real estate. But in *PRLA* this Court made clear that such a burden-in-fact,[14] by itself, is not necessarily a burden for purposes of the

---

[12] *PRLA*, 211 A.3d at 816-17 (cleaned up).

[13] 53 Pa.C.S. § 2962(f).

[14] The word "burden" does not appear in the text of the Business Exclusion, but this Court has used the term as a convenient catch-all to describe "duties, responsibilities, or requirements." It should be understood accordingly—with the caveat most clearly stated in *PRLA* that not all impositions upon businesses, no matter how trivial or ambiguous, will trigger the Business Exclusion.

inquiry we have prescribed in assessing whether the Business Exclusion is fatal to an ordinance. Rather, the burden must be "affirmative" in nature.

When this litigation began, however, this Court had not yet decided *PLRA*. In its absence, the trial court applied a seemingly binary inquiry into the presence or absence of *any* burden, assessing the practical effects of the Nondiscrimination Ordinance with predictable results:

> The City's Ordinance makes participation in the Section 8 program mandatory. Landlords will be forced to comply with the numerous and often burdensome requirements of the Section 8 program. For example, they will have to use the Housing Authority's model lease and/or submit a preferred lease to the Housing Authority for preapproval. That lease must include word for word provisions of the [Housing and Urban Development] Tenancy Addendum. They will be prohibited from including notice of termination waivers in leases and must accept a mandatory "cure period" of five days in advance of issuing a Notice to Quit[. ]Landlords will be required to accept "reasonable rent" obligations as established by the Housing Authority and provide at least 60 days' notice of any change in rent amounts. They will have to obtain approval from the Housing Authority to raise a tenant's rent. Finally, landlords will be forced to agree to month-to-month leases subsequent to an initial one[-]year lease term.[15] Neither Pennsylvania common law nor the Pennsylvania Landlord and Tenant Act of 1951[16] contain[s] such requirements.[17]

---

[15] Although the scope of the Nondiscrimination Ordinance reaches farther than just the Section 8 program, the lower courts and the parties have focused on the manifold obligations and restrictions imposed upon landlords by that program as a proxy for any other burdens that may be placed upon the various subjects of the Ordinance. While the parties characterize the obligations that come with Section 8 participation quite differently, this enumeration of responsibilities, which derives from federal statutory and regulatory provisions, is not materially disputed. We also find that approach sufficient for determining the validity of the Ordinance.

[16] Act of April 6, 1951, P.L. 69, art. I, *codified as amended at* 68 P.S. §§ 250.101-602.

[17] *Apartment Ass'n*, 2018 WL 10140300, at *2.

Finding no genuine issue of material fact regarding whether the Ordinance imposed duties and requirements on residential property owners, and without further discussion, the trial court denied judgment on the pleadings to the City and granted summary judgment to the Association.[18]

The City appealed to the Commonwealth Court, which affirmed in a unanimous *en banc* decision on March 12, 2019—again before this Court decided *PRLA*.[19]  The City sought this Court's review in an April 11, 2019 Petition for Allowance of Appeal.  On July 17, 2019, during the pendency of that petition, we issued our decision in *PRLA*.  And on September 9, 2019, we granted the City's Petition, vacated the Commonwealth Court's prior order affirming the trial court's entry of judgment for the Association, and remanded

---

[18]    The trial court noted the Commonwealth Court's then-recent decision in *Pennsylvania Restaurant & Lodging Association v. City of Pittsburgh*, 79 & 101 C.D. 2016, 2017 WL 2153813 (Pa. Cmwlth. May 17, 2017)—which we later affirmed in part and reversed in part—in which the Commonwealth Court affirmed the trial court's order striking down both the Sick Days Act and the Buildings Act.  The trial court contrasted that Commonwealth Court decision and other similar cases, *see, e.g.*, *Smaller Manufacturers Council v. Council of the City of Pittsburgh*, 485 A.2d 73 (Pa. Cmwlth. 1984) (invalidating Pittsburgh ordinance requiring notice to the City of plant closings or relocations), with *Hartman v. City of Allentown*, 882 A.2d 737 (Pa. Cmwlth. 2005), in which the Commonwealth Court upheld a non-home-rule municipality's ordinance prohibiting discrimination on the basis of sexual orientation and gender identity in employment, housing, and public accommodations.  The court held that *Hartman* differed from the Commonwealth Court's decisions in *Smaller* and *PRLA* because *Hartman* did not impose an *affirmative* burden on businesses, only narrowly proscribing certain discriminatory conduct relative to a class of people who would only present such duties and burdens to business serving other similarly situated people. Despite recognizing this distinction, which, as discussed below is critical to the Business Exclusion inquiry, the court did not address the statutory-authority exception to the Business Exclusion.

[19]    *Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*, 205 A.3d 418 (Pa. Cmwlth. 2019) (*en banc*).

for reconsideration in light of *PRLA*.[20] On remand, the Commonwealth Court again affirmed by the unanimous *en banc* decision[21] that now is before us.

Although *PRLA* was not the first case in which we considered the degree to which the Business Exclusion may impose upon home rule,[22] it is our most recent, and the most similar to this case. In *PRLA*, we confronted two separate ordinances, each of which, we found, imposed affirmative duties on certain Pittsburgh businesses. Thus, we concluded that the validity of each reduced the question to whether there existed an "express" statutory authorization of the exercise of local authority sufficient to qualify for the Business Exclusion's exception.[23]

In support of the Sick Days Act, the City cited, among other things, the Disease Prevention and Control Law of 1955 ("DPCL"),[24] and specifically its provision that qualifying home-rule municipalities "may enact ordinances or issue rules and regulations relating to disease prevention and control."[25] Accordingly, we examined whether the

---

[20] *Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*, 217 A.3d 801 (Pa. 2019) (*per curiam*).

[21] *Apartment Ass'n*, 228 A.3d 960.

[22] See *Bldg. Owners & Mgrs. Ass'n of Pittsburgh v. City of Pittsburgh*, 985 A.2d 711 (Pa. 2009) (hereinafter "*BOMA*").

[23] As noted above, and as evident in the text of the relevant provisions, while the legislature is free to limit home-rule authority by statute, the Business Exclusion itself provides an exception where authority to impose upon businesses is "expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities." 53 Pa.C.S. § 2962(f).

[24] Act of April 23, 1956, P.L. 1510, *codified as amended at* 35 P.S. §§ 521.1-.21.

[25] 35 P.S. § 521.16(c). The question of what "qualified" a home-rule municipality to enact such ordinances was a source of disagreement within this Court, because it hinged upon a disputed interpretation as to when a municipality is one that has a "board[] or

above language was sufficiently *specific* in its grant of legislative authority to constitute an "express" statutory authorization to impose an obligation upon employers to provide paid sick leave to their employees, which brought substantial financial and administrative burdens.

We observed that "the concept of express authority, when measured against the potential complexity of acting upon it when it is broadly-stated, proves imprecise."[26] The number of ways a municipality might act to prevent or mitigate disease are innumerable, as are the ways in which such actions might burden businesses. To require the legislature to specify each permissible action and concomitant burden in detail "would hamstring home-rule municipalities from exercising their home-rule authority in any way that burdens businesses, even where such burdens are incidental or *de minimis*," undercutting the general presumption in favor of home rule.[27] Although the Sick Days Act burdened businesses, we found that it bore "a direct nexus with public health" and that the burdens imposed were "incidental" to the direct and authorized local authority to legislate in furtherance of disease prevention.[28] Therefore, the Sick Days Act lay "squarely within both the City's traditional police powers and the ambit of the DPCL."[29]

---

department[] of health" when that function is served by a body of the county in which the municipality lies. A majority of this Court concluded that Pittsburgh qualified. *See PRLA*, 211 A.3d at 825-28.

[26] *PRLA*, 211 A.3d at 831.

[27] *Id.* at 832; *see* 53 Pa.C.S. § 2961 ("All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.").

[28] *PRLA*, 211 A.3d at 832.

[29] *Id.*

The Buildings Act, by contrast, had no clear basis in any of the statutes the City submitted. The Buildings Act imposed upon various owners, managers, and employees of thousands of properties in the City of Pittsburgh various initial and continuing education and training obligations, all to "ensure that security officers and other building service workers are trained in a range of essential skills, including counterterrorism, crime prevention, fire and other building safety, disaster recovery, first aid, and coordination with police, fire, and emergency personnel during an emergency."[30] The City cited various sources of statutory authority, but we found none of them clear or direct enough to carry the weight the City asked of them.

For one, the City cited provisions of the Second Class City Code ("SCCC")[31] relating to building regulations, which provided for a department of public safety to promulgate rules and regulations to mitigate fire risks. But while the Buildings Act delegated an administrative role to the Fire Bureau in service of the Buildings Act's provisions, the connection between the Buildings Act as a whole and fire mitigation was insufficiently direct to qualify for the Business Exclusion's exception.

We also rejected the City's invocation of the SCCC's codification of the police power.

> While we have rejected the proposition that the [Business Exclusion exception's] "express [statutory] authorization" precludes any generality whatsoever, we certainly do not suggest that what amounts to a broad account of traditional police powers constitutes "express" authorization for purposes of the Business Exclusion exception. Were we to do so, the

---

[30]    *Id.* at 833 (quoting Buildings Act § 410.02); *see generally id.* at 832-34 (detailing the Buildings Act's many requirements).

[31]    *See* Act of Mar. 7, 1901, P.L. 20, art. XX, *codified as amended at* 53 P.S. §§ 22101-28707.

exception would devour the rule quite completely. [53 P.S. §§ 23145 and 23158[32]] amount to a general warrant to legislate in service of the general health and welfare, which lies within a home-rule municipality's powers absent any statutory prohibition. Here, however, the Business Exclusion furnishes such a prohibition.[33]

Next, we rejected the City's resort to Subsection 2962(c)(4) of the HRC, which limits the broad statutory prohibition against local regulation of "the manufacture, processing, storage, distribution and sale of any foods, goods or services subject to any Commonwealth statutes and regulations," by carving out an exception for "the power of any municipality to enact and enforce ordinances relating to building codes or any other safety, sanitation or health regulation pertaining thereto."[34] The City sought support in the exception for "any other safety, sanitation or health regulation," but disregarded the "pertaining thereto" language, which we held limited the preceding clause's application to "ordinances relating to building codes."[35] Allowing municipalities to overlay protections of

---

[32]     Section 23145 grants second-class cities the power "[t]o make regulations to secure the general health of the inhabitants, and to remove and prevent nuisances." 53 P.S. § 23145. Section 23158 grants power:

> To make all such ordinances, by-laws, rules and regulations, not inconsistent with the Constitution and laws of this Commonwealth, as may be expedient or necessary, in addition to the special powers in this section granted, for the proper management, care and control of the city and its finances, and the maintenance of the peace, good government and welfare of the city . . . .

*Id.* § 23158.  Inasmuch as Section 23158 limits local legislation to those enactments that are "not inconsistent with the . . . laws of this Commonwealth," it also appears to conflict with the Business Exclusion under the circumstances in *PRLA* and this case.

[33]     *PRLA*, 211 A.3d at 835.

[34]     *Id.* (quoting 53 Pa.C.S. § 2962(c)(4)).

[35]     *Id.*

local concern upon state requirements regarding building codes, sanitation, and the like was "a far cry from authorizing staff education and training requirements in subjects with little or no connection to building codes generally."[36]

Finally, the City invoked the Emergency Management Services Code,[37] which mandates that political subdivisions establish local emergency management organizations compliant with the plans created by the Pennsylvania Emergency Management Agency.[38] The Emergency Code requires each political subdivision to adopt an intergovernmental cooperation agreement with other subdivisions, which are obligated collectively to maintain emergency management plans to prevent and minimize injury and damage caused by disaster and to ensure an effective response to such disasters.[39] The City asserted that these requirements authorized building personnel training requirements that advance the same ends. We acknowledged that the Code alluded to training, but determined that in its full statutory context it did not provide "an express grant of authority to impose any training programs upon any private employers and private employees that a municipality can tenuously connect to disaster preparedness."[40] We explained that "[i]t is one thing to say that the Commonwealth intends that local municipalities have an obligation to respond effectively to disasters and

---

[36]     *Id.*

[37]     *See* Act of Nov. 26, 1978, P.L. 1332, No. 323, *codified as amended at* 35 Pa.C.S. §§ 7501-7931 & 79a01-79a31.

[38]     *See* 35 Pa.C.S. § 7501(a).

[39]     *See id.* §§ 7503(1)-(3) & (7).

[40]     *PRLA*, 211 A.3d at 836.

should plan for same. It is quite another to establish a grant of authority that is in derogation of the Business Exclusion."[41]

Ultimately, two factors distinguished the Buildings Act from the Sick Days Act. First, there was a substantial connection between workplace illness and disease transmission, so mandating the provision of paid sick leave would reduce community transmission of illness by encouraging infected workers to stay home from work. That provided the requisite "nexus" with the DPCL's overarching intention. Second, the DPCL specifically authorized a municipality's enactment of "ordinances" to advance the statute's ends.[42] The DPCL's express allowance for ordinances informed by local departments of health that are tailored to the needs of a community was clear enough, as was the consistency of the Sick Days Act with these ends.

None of the proposed authorities the City cited to support the Buildings Act had the same qualities. The connections the City asserted between the Buildings Act's intent and provisions and the substance of the proposed authorizing statutes were strained. And none of the statutes expressly authorized the enactment of local ordinances in furtherance of those statutes' aims.

Having established this background, we return to the instant case, which we remanded to the Commonwealth Court to review in light of our decision in *PRLA*. On remand, the Commonwealth Court's again-unanimous *en banc* ruling integrated *PRLA* into its reasoning but otherwise deviated very little from its pre-*PRLA* analysis.

---

[41]    *Id.*

[42]    *See* 35 P.S. § 521.16 ("Municipalities which have boards or departments of health or county departments of health may enact ordinances or issue rules and regulations relating to disease prevention and control . . . . ").

As *PRLA* explains, two questions drive the Business Exclusion inquiry, and the Commonwealth Court correctly structured its review accordingly. First, a threshold question: does an ordinance impose an affirmative burden on businesses—that is, does it require businesses to act in ways they would not be obligated to act in the absence of the challenged ordinance. Although this inquiry in a sense identifies more than one variety of burden, the nature of the question renders it more binary than qualitative, albeit not perfectly so.[43] Not *all* arguable burdens, however *de minimis* or incidental to other purposes, will trigger the Business Exclusion's protections in the first place. In those cases, the inquiry ends at step one, and requires no determination of whether the local law is authorized by another express statutory warrant.

For example, in *Hartman v. City of Allentown*,[44] the Commonwealth Court held that an ordinance adding protections against discrimination based upon sexual orientation and gender identity to an existing municipal nondiscrimination ordinance did not require any affirmative steps by those to whom it applied, either directly or as a secondary effect of a duty *not* to act in a certain fashion. Consequently, the Commonwealth Court found no affirmative burden and upheld the local law.[45] In this case, however, the Commonwealth

---

[43]   *Cf. PRLA*, 211 A.3d at 831 ("[T]he line between what constitutes an affirmative obligation and a non-affirmative obligation is not as clear as one might suppose.").

[44]   880 A.2d 737 (Pa. Cmwlth. 2005).

[45]   *The Hartman* court contrasted the ordinance at issue in that case with the ordinance it deemed invalid in *Smaller Manufacturers Council*, 485 A.2d 73, in which the stricken ordinance required manufacturing businesses to report in advance to the City of Pittsburgh any planned manufacturing plant closing or relocation, events with broad economic implications. The *Hartman* court observed that the ordinance in *Smaller* "was designed and intended to place affirmative duties of business management on businesses in Pittsburgh." *Hartman*, 880 A.2d at 746. Conversely, the nondiscrimination ordinance in *Hartman* was not "designed or intended to impose affirmative duties of

Court held that the secondary effects of landlords' effectively mandatory participation in the Section 8 program constituted a burden in the relevant sense, for all the reasons stated above.[46]

Where an affirmative burden (so defined) is detected, the court next must determine whether that burden is authorized by some statutory grant of authority to impose it. Thus, the court turned to consider the City's proposed sources of express statutory authority.

First, the court rejected the City's resort to the SCCC's general police-power, finding that our categorical rejection in *PRLA* of those provisions as express authority for any ordinance that otherwise falls afoul of the Business Exclusion applied equally under the facts of this case. The Commonwealth Court explained that "the City failed to demonstrate a direct nexus between [53 P.S. § 23158] and the Ordinance to satisfy the exception in the Business Exclusion. Nothing in [Section 23158] permits the City to enact legislation requiring residential landlords to participate in an otherwise voluntary federal housing subsidy program."[47] Relatedly, the court rejected the City's invocation of *Hartman* as evidence that Section 23158 furnished qualifying authority under the

---

business management on businesses; rather, the [o]rdinance [was] intended to protect Allentown's citizens from discrimination." *Id.* at 747.

[46] The City observes that not *all* landlords will have Section 8 tenants. The Ordinance merely requires that *when* otherwise qualified Section 8 recipients present themselves for consideration, they may not be rejected because they will use Section 8 vouchers to meet their rent obligations. City's Br. at 48-49. But the City does not dispute that many landlords who would not choose to accept Section 8 tenants may find themselves with no choice, and bound to the concomitant restrictions on their rights under the Landlord and Tenant Law and administrative obligations of the Section 8 program.

[47] *Apartment Ass'n*, 228 A.3d at 971.

circumstances of this case for the local expansion of anti-discrimination ordinances. The court observed that, as set forth above, the ordinance in *Hartman* was not upheld based upon any express statutory authority, whether derived from the SCCC or another statute. The *Hartman* court instead found that the ordinance imposed no affirmative burden, which was dispositive in the municipality's favor without further inquiry.

The court also rejected the City's argument that it was antithetical to the nature of home rule to interpret the HRC in a fashion that left home-rule municipalities with less local authority to govern local commerce than non-home-rule municipalities. It correctly noted that the *PRLA* Court rejected the same argument:

> [T]he [*PRLA*] Court explained that "a home-rule municipality cannot, *except where specified clearly by statute or the municipality's own charter*, find itself vested with less power than a non-home-rule counterpart." [*PRLA*], 211 A.3d at 824 (emphasis added). In the instant case, as in [*PRLA*], we conclude that "the Business Exclusion furnishes such a prohibition." *Id.* at 835.[48]

The court then turned to the City's invocation of the Pennsylvania Human Relations Act ("PHRA").[49] The City observed that the PHRA expressly prohibits housing-related discrimination "by reason of . . . race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability."[50] The City insisted that legislative intent to furnish express authority to enact an ordinance prohibiting source-of-income

---

[48]     *Id.* at 972.

[49]     Act of Oct. 27, 1955, P.L. 744, No. 222, *codified as amended at* 43 P.S. §§ 951, *et seq.*

[50]     43 P.S. § 952; *see, inter alia, id.* § 955(h)(1) (prohibiting the refusal to lease any housing accommodation to any person based upon several enumerated classes, including those recited in the sentence to which this citation is appended).

discrimination inhered in the Act's provision "authoriz[ing] the establishment of membership in and support of a Local Human Relations Commission."[51] The City further observed that the General Assembly provided that the PHRA should "be construed liberally for the accomplishment" of its purposes, and that "nothing contained in [the PHRA] shall be deemed to repeal or *supersede any* of the provisions of any existing or *hereafter-adopted municipal ordinance* . . . relating to discrimination because of race" and the other classes enumerated above.[52] The City thus argued that the Ordinance and its stated intentions aligned with the PHRA's intent to ameliorate racial discrimination, so any administrative burdens imposed upon landlords are incidental to that purpose. Thus, the City asserted that the Ordinance resembles the Sick Days Act, because, as in *Hartman*, it focuses upon protecting its citizens from discrimination, and because, as in *PRLA*, the burdens associated with the Ordinance are "incidental" to its broader purpose of mitigating discrimination.

The Commonwealth Court rejected the analogy to the Sick Days Act:

> The problem with the City's position . . . is that . . . the addition of the "source-of-income" class does more than just ban housing discrimination based on source of income. By expressly defining "source of income" to include federal housing assistance, and specifically Section 8 Program vouchers, the Ordinance requires residential landlords to participate in the Section 8 Program, when previously their participation was wholly voluntary.[53]

---

[51]     *Id.* § 962.1.

[52]     *Id.* §§ 962(a), (b) (our emphasis).

[53]     *Apartment Ass'n*, 228 A.3d at 973. The lower court's emphasis on the "voluntariness" of participation in the Section 8 program without the Nondiscrimination Ordinance in effect suggests that what Congress has made voluntary cannot by local fiat be made mandatory, an argument with federal preemption overtones. *Id.* at 975 (citing, *inter alia*, *Salute v. Stratford*, 126 F.3d 293 (2d Cir. 1998) (rejecting the argument that

The court instead found the Nondiscrimination Ordinance to be "more akin to the Buildings Act," which this Court struck down in *PRLA*. In particular, the court found support for striking down the Nondiscrimination Ordinance in how this Court rejected the argument that the HRC's grant of authority to enact building codes and safety regulations authorized the City to impose the broader training and qualification requirements on thousands of building staff of all varieties.[54] "While the PHRA is aimed at protecting citizens from discrimination," the court explained, "the Ordinance here goes far beyond that aim" by effectively requiring many landlords to participate in the Section 8 program with its collateral obligations.[55]

We find no obvious flaw in the Commonwealth Court's account of *PRLA*—or in its application of that case to the Ordinance, as far as its analysis goes. For one, we agree that resort to the SCCC's embodiment of the general police power as an express grant of authority sufficient to qualify for the Business Exclusion's exception is precluded by our rejection of the same argument in *PRLA*. To hold otherwise here would invite precisely the scenario we cautioned against in *PRLA*, in which "the exception would devour the rule quite completely."[56]

---

landlords who refuse to rent to disabled Section 8 voucher-holders violate the Fair Housing Amendments Act's "take one, take all" provision, and endorsing another federal court's view that "because the Section 8 program is voluntary and non-participating owners routinely reject Section 8 tenants, the owners' 'non-participation constitutes a legitimate reason for their refusal to accept Section 8 tenants and . . . we therefore cannot hold them liable for discrimination under the disparate impact theory'")). While interesting, the question of voluntariness does not factor into our analysis.

[54]     *Id.* at 974.

[55]     *Id.*

[56]     *PRLA*, 211 A.3d at 835.

The lower court's treatment of the City's resort to the PHRA, too, is well-reasoned, if brief. We agree that the DPCL's express statutory grant of local legislative authority in furtherance of public health at issue in *PRLA,* along with the other indicia of the General Assembly's intent to grant political subdivisions significant authority to tailor municipal laws and regulations to local needs, distinguish that case from the City's present reliance upon the PHRA, which expressly grants no analogous *law*-making authority. And while the Sick Days Act focused upon ensuring a core benefit to individuals that directly served the ends of the DPCL, with what we determined to be substantial but incidental burdens on certain employers, in this case the complex web of administrative obligations unwilling landlords must accept to satisfy the Ordinance finds no equally clear source of statutory authority. In that sense, the Ordinance more closely resembles the stricken Buildings Act.

Having said as much, we nonetheless must not focus on the onerousness of the burden rather than the *fact* of it. The City contends that the Commonwealth Court did precisely that, dwelling on qualitative aspects of the Ordinance's collateral burdens under Section 8 rather than accepting the fact of an affirmative burden and turning to examine the proffered sources of statutory authority for imposing it. Taking the lower court's analysis at face value, this is not an unfair observation. It can be difficult in reading that opinion to discern when the affirmative burden inquiry ends and the statutory authority inquiry begins. And in fairness, a similar (if lesser) degree of murkiness is detectable in *PRLA,*[57] for the line dividing the two can be as difficult to draw in practice as the line

---

[57] The difficulty lay in the occasional digression into qualitative descriptions of the effect of the ordinances at issue, especially the Buildings Act. *See, e.g., id.* at 836

between affirmative burdens and negative or passive burdens (for want of a better antonym).

Nevertheless, our dispositive analysis in *PRLA*, and the lower court's analysis in this case, required no resort to qualitative assessments. In both, the recitation and characterizations of the burdens provided rhetorical texture, but did not detract from the analysis of whether there were express statutory warrants for the imposition of those burdens (whatever their quantum) despite the Business Exception. That much is clear from our determination that the Sick Days Act could stand, despite the expense and administrative complications it imposed upon businesses. In effect, we held that even a substantial burden may be incidental for purposes of the Business Exclusion if the statutory warrant for it is clear.

The acknowledgment that a non-trivial burden on business may nonetheless be incidental in the material sense, and permissible as such, lies at the heart of the City's strongest argument—that in this case, as with the Sick Days Act, the Nondiscrimination Ordinance, which the City contends conforms narrowly to the PHRA's core purpose to curb racial discrimination (albeit by proxy), *does* bring with it considerable affirmative burdens. However, the argument continues, those burdens are "incidental" to the narrow purpose of protecting *individuals* from discrimination based upon the means by which

―――――――――――――――

("Nothing about [the language of the Emergency Code] suggests that it can support imposing broad obligations upon virtually all private building staff, from security to custodial."). But these occasional asides are largely eclipsed in the analysis by our focus upon the presence or absence of statutory authority, taking for granted that the threshold affirmative burden requirement was satisfied.

they pay their rent.[58]  This argument conforms precisely to the two-step inquiry we have constructed, and it invokes the core reasoning we relied upon in upholding the Sick Days Act.  Unfortunately for the City, it is unavailing.

The Commonwealth Court spent very little time on the City's argument that its stated intentions—*i.e.*, to ameliorate the use of Section 8 discrimination as a stalking horse for racial discrimination and to reduce the consequent concentration of Section 8 voucher holders in underserved "majority-minority" neighborhoods—served the PHRA's explicit objects.  Indeed, the City correctly observes that the PHRA "expressly recognizes obtaining housing accommodation without discrimination as an enforceable civil right within Pennsylvania."[59]  Section 953 provides: "The opportunity for an individual . . . to obtain all the accommodations, advantages, facilities and privileges of any housing accommodation . . . without discrimination because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, [or] national origin . . . is hereby recognized as and declared to be a civil right . . . ."[60]  The City also cites the PHRA's putatively implicit allowance of local nondiscrimination ordinances and local enforcement—through, for example, the formation of a local Human Relations Commission.[61]  And it underscores the Commonwealth Court's recognition in *Hartman*

---

[58]    *Cf. id.* at 831 (noting that this Court's decision in *BOMA* "left the door open to ordinances that impose incidental burdens in service of general welfare").

[59]    City's Br. at 28.

[60]    43 P.S. § 953.

[61]    *See* City's Br. at 29 (citing 43 P.S. § 962.1(a) ("The legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Rights Commission."); 43 P.S. § 962.1(d) (authorizing local legislatures to grant local human rights commissions powers and duties); 43 P.S.

that home-rule municipalities may expand anti-discrimination protections beyond the scope of state-level protections without offending the Business Exclusion.

The difficulty with this argument is that the more specifically the General Assembly describes what can be done, the more we must infer that its omission of other exercises of local authority were not merely accidental or due to the expectation that we would understand the specific delineations of authority to tacitly confer much more.[62] Even taking the City's citations to the PHRA in precisely the way they are selected and arrayed in the City's brief, none of them clearly authorizes adding a class as to which discrimination will be proscribed in a way that brings the sort of affirmative burdens on business absent from *Harman*.

We can acknowledge, but still set aside, the aim of the PHRA to combat discrimination, including in housing. It is not the intent that concerns us, but what local action it expressly authorizes in service of that objective.

The City's argument from the PHRA, stripped of its detours and digressions, draws from a pair of PHRA provisions that expressly authorize local action. First, it cites 43 P.S. § 962.1, which provides that "[t]he legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission." But it is by no means clear that authorizing the

---

§ 962(b) ("[N]othing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, municipal charter, or any law of this Commonwealth relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability . . . .")).

[62] *See Thompson v. Thompson*, 223 A.3d 1272, 1276 (Pa. 2020) ("Under the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters." (internal quotation marks omitted)).

creation of such a body, by ordinance or otherwise, tacitly authorizes the passage of more expansive local ordinances that affirmatively burden businesses.

The City also relies upon Subsection 962(b) of the PHRA. But it extracts the language it relies upon (italicized below) from its full context, which we restore below:

§ 962. Construction and exclusiveness of remedy

(a) The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply.

(b) Except as provided in subsection (c), *nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance*, municipal charter or of any law of this Commonwealth relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability, but as to acts declared unlawful by section five of this act the procedure herein provided shall, when invoked, be exclusive and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the complainant concerned. . . .

(c)(1) In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in this act, that individual's right of action in the courts of the Commonwealth shall not be foreclosed. . . .[63]

The remaining provisions of Section 962 go to various concerns associated with venue and procedural matters associated with discrimination claims and remedies before state and other bodies.

The details are not as important as what they say about this section's design and intent. Simply put, this provision is about *remedies*, and its allowance for local regulations in no way alludes to the expansion of classes of those against whom discrimination may be sanctioned. All it does, on its face, is preserve the rights of claimants alleging discrimination to invoke either state or local remedies, but not both. This cannot

---

[63] 43 P.S. § 962 (emphasis added).

reasonably be read as an express authorization to conceive of a non-racial proxy for racial discrimination and thereby saddle businesses with affirmative burdens, notwithstanding the Business Exclusion.

The City then embarks on an interesting but irrelevant series of arguments that may reinforce the effectiveness of combating racial discrimination by minimizing housing-voucher discrimination,[64] but do not establish the sort of express authority the Business Exclusion requires. Among these are a novel argument that, "[b]y enacting the Nondiscrimination Ordinance, the City is enabling implementation of federal housing policy as evinced by the United States Housing Act of 1937"—*i.e.*, "to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families," and to "provid[e] decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments"[65]—and the Fair Housing Act of 1968 ("FHA")—*i.e.*, "to eradicate discriminatory practices within a sector of our Nation's economy."[66] The City notes that federal courts have found that disparate impact claims are available under the FHA, and that the United States Supreme Court has held that "unlawful practices [under the FHA] include[e] zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification."[67]

---

[64]    *See* City's Br. at 31-34.

[65]    *Id.* at 32 (quoting 42 U.S.C. §§ 1437(a)(1)(B) and 1437(a)(4), respectively).

[66]    *Id.* at 32-33 (quoting 42 U.S.C. § 3604(a)).

[67]    *Id.* at 33 (citing *Texas Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539 (2015)).

These arguments from federal law are attenuated from the question whether Commonwealth law allows the City to substitute the consonance of its legislative goals with those of federal law for the express authority the Business Exclusion exception requires. Moreover, the City did not raise this line of argument before the Commonwealth Court either of the times it briefed this case in that court. And on no credible account can the questions be characterized as fairly subsumed by those we elected to review.[68] Accordingly, the City cannot pursue these arguments now, having failed to do so earlier in this litigation.[69]

---

[68] These are the questions we granted review to answer:

(1) Did the Commonwealth Court err where it failed to follow the dictates of this Honorable Court in [*PRLA*], and rather than analyzing whether the Second Class City Code and the Pennsylvania Human Relations Act satisfy the "expressly provided by statute" exception to the Business Exclusion (*i.e.* whether relevant statutory authority has a nexus to the core functions of the Nondiscrimination Ordinance) as [*PRLA*] requires, the Commonwealth Court instead focused its analysis on the perceived weight of the burdens that the Nondiscrimination Ordinance might impose on landlords?

(2) Does the Commonwealth Court's [r]emand [d]ecision invalidating the Nondiscrimination Ordinance improperly narrow Home Rule authority, providing non-Home Rule municipalities with greater authority to enact anti-discrimination legislation than Home Rule municipalities, all contrary to the clear intent of the HRC?

*Apartment Ass'n of Metro. Pittsburgh, Inc. v. City of Pittsburgh*, 240 A.3d 612 (Pa. 2020) (*per curiam*).

[69] In their well-argued joint brief, a*mici curiae* the Fair Housing Partnership of Greater Pittsburgh, the Poverty & Race Research Action Council, and the National Housing Law Project contend:

To the extent that [the Business Exclusion] bars the City of Pittsburgh from legislating to protect its residents against source-of-income discrimination—which, as the evidence of record in this case established, has become a proxy for unlawful discrimination on the basis of race, national origin and familial status—then [it] conflicts with and is preempted by the [FHA], 42 U.S.C. §§ 3601, *et seq.*, and the Housing and Community Developments

Ultimately, though, the City cannot escape the gravitational pull of the question whether the PHRA's legislative delegation of some authority to home-rule municipalities to combat discrimination can sustain the Nondiscrimination Ordinance. And so the City necessarily returns to its emphatic position that to require that the PHRA specifically refer

Act of 1974 . . ., 42 U.S.C. §§ 5301, *et seq.*[, both of which seek to prevent racial discrimination in housing.]

*Amici Curiae* Br. at 15. This argument echoes the City's attempt, discussed above, to find vindication and support in federal statutes for regulating source-of-income discrimination to eradicate its use as a pretext for race-based discrimination. Anticipating the obvious rebuttal—that this issue is waived both because it has not been preserved and because *amici curiae* may not raise issues not raised by the party they support— *amici* observe correctly that questions of federal preemption go to subject matter jurisdiction, and therefore cannot be waived on procedural grounds. *See id.* at 20 (citing, *inter alia*, *Werner v. Plater-Zyberk*, 799 A.2d 776, 787 (Pa. Super. 2002) ("Federal preemption is a jurisdictional matter for a state court because it challenges . . . the competence of the court to reach the merits of the claims raised.")).

Be that as it may, the preemption claim is weak at best. It is well-established that there are three flavors of federal preemption—express preemption, field preemption, and conflict preemption. *Amici* do not suggest that express or field preemption apply, which leaves only conflict preemption. Conflict preemption applies only "(a) when it is physically impossible to comply with both the state and the federal law, or (b) when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Werner*, 799 A.2d at 787 (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). While *amici* credibly assert that the Ordinance advances federal goals as articulated in the statutes cited, their claim that the failure to do so, or that a state statute's interference with the City's efforts to address race-based discrimination, act as an *obstacle* to the accomplishment and execution of Congress's intent is questionable. *Amici* do not allow for the prospect that local action or inaction may confound or frustrate federal intent without precluding that intent's vindication by other courses of action, for example through federal enforcement actions or the instantiation of new federal regulations. Notably, pretextual uses of Section 8 discrimination to mask race-based discrimination may be remediable under federal law, albeit on a case-by-case basis. *Cf. Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 911 (5th Cir. 2019) ("[T]he vague and conclusory allegations of disparate treatment that [the plaintiff] asserts collectively against [the defendants] are legally insufficient to support a reasonable inference of intentional race discrimination."). Thus, we do not believe that conflict preemption can rescue the Ordinance from its peril under state law.

to the authority to pass ordinances—as does the DPCL, as discussed and relied upon in *PRLA*—imposes an artificial restriction, and that the PHRA provides sufficient authority in the other closely related provisions above. Reinforcing the point, the layered presumptions calling for the liberal construal of the HRC in favor of local authority,[70] and of the PHRA in favor of its anti-discriminatory ends,[71] provide additional and sufficient statutory authority to overcome the Business Exclusion.[72]

Animating this recurrent aspect of the City's argument, though it never quite spells it out in this fashion, is the strongest point in its favor—this Court tends to privilege substance over form,[73] and demanding "magic" or totemic language from the legislature invites untenable results. Consequently, we do not foreclose the prospect that ordinance-making authority might be expressly authorized by a statute that does not confer such authority in quite those terms.

But this is not that case and the PHRA is not that statute. Not only does the PHRA not expressly furnish such authority, it also explicitly describes and confers upon local commissions other forms of authority: as set forth above, the authority to create a local human relations commission, the authority to provide local remedies for proscribed

---

[70] *See* 53 Pa.C.S. § 2961 ("All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.").

[71] *See* 43 P.S. § 962(a) ("The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof.").

[72] *See* City's Br. at 35-37.

[73] *Cf. Baehr Bros. v. Commonwealth*, 409 A.2d 326, 329 (Pa. 1979) ("Form over substance is not the law of this Commonwealth, and, quite to the contrary, tax cases must be decided on realities.").

discrimination as an alternative to state remedies under the PHRA, and so on. Rather than support the City's argument, this enumeration undermines it. Where the General Assembly expressly grants clearly delineated authority, we presume that it does not intend to confer additional authority by implication. Cases like *Hartman* stand for the proposition that home rule, and the police power generally, furnish broad authority to legislate locally in the absence of a constitutional or statutory limitation.[74] Here the Business Exclusion presents such a statutory limitation, and may be avoided only when the express statutory authority criterion is satisfied. Such authority is missing here.

As a final overarching effort to resist this conclusion, the City insists that even if neither the SCCC nor the PHRA standing alone furnishes the requisite authority, the two statutes together do. But for the reasons we rejected the SCCC argument in *PRLA*, this argument too must fail. To allow the SCCC to make sufficient the otherwise inadequate authority of a given statute would no less create an exception so broad as to swallow the Business Exclusion as it would have to find in *PRLA* that the SCCC effectively revived the Buildings Act from its deathbed. The SCCC simply can have no bearing on other statutes' ability to trigger the Business Exclusion exception without fatally undermining legislative intent to constrain local authority to impose upon business interests.

---

[74] As noted above, *Hartman* is distinguishable because it did not proceed past the question of burden. It also is not controlling in any event, being a decision of the Commonwealth Court. But it is perhaps useful to consider by analogy why the burden-in-fact imposed by the ordinance at issue in *Hartman* differs from the affirmative burden imposed in this case, by applying the *Hartman* ordinance to the housing context. After *Hartman* upheld the nondiscrimination ordinance there at issue, an Allentown landlord no longer could exclude a prospective tenant because of sexual orientation—but, having rented a property to a tenant the landlord might otherwise have refused, the landlord was bound to do nothing more than the landlord already did for other tenants. There were no new responsibilities in play for the landlord, only new participants in the relevant relationships.

The Commonwealth Court's opinion is not without its flaws, which the City highlights effectively. In particular, the City is correct that the lower court's analysis focuses upon the severity of the Section 8 burden on landlords to the exclusion of the critical question of statutory authority, at least by word count and frequency of reference. The City also is correct that, in doing so, the lower court's analogy to our rejection of the Buildings Act is weakened by the undeniable fact that the Sick Days Act, too, created substantial and new responsibilities, both fiscal and administrative, for businesses. Had we relied upon the quantum of burden in *PRLA*, it seems substantially more likely that the Sick Days Act and Buildings Act both would have fallen.[75] But despite its digressions concerning the burdens of Section 8 compliance, the Commonwealth Court nonetheless recognized that, the affirmative burden having been established, only the question of express statutory authority remained. In that regard, for the above reasons, we agree with the lower court that the PHRA cannot carry the Nondiscrimination Ordinance in the same way the DPCL carried the Sick Days Act.

The nexus between the PHRA's intent and that of the Nondiscrimination Ordinance may be clearer than that between the Buildings Act and the statutes offered in its support, and arguably more resembles the connection between the Sick Days Act and the DPCL. But those abstract observations do not change the fact that the mechanical attempt to find authority in the PHRA required by the Business Exclusion is no more effective than

---

[75]     *But see* City's Br. at 44 ("Though irrelevant to determining if the Nondiscrimination Ordinance falls within the exception to the Business Exclusion, if this case were a simple weighing of burdens, it would appear that the burdens carried by the voucher holders unable to use their vouchers and obtain safe, affordable housing due to source of income discrimination are greater than those of landlords who potentially would have to participate in the voucher program.").

the analogous effort to find textual support for the Buildings Act in the various provisions the City cited in *PRLA*. In both cases, the statutes invoked simply do not confer broad ordinance-making authority of the sort ventured by the City. Consequently, whichever of the Sick Days Act or the Buildings Act the Nondiscrimination Ordinance more closely resembles in its goals relative to the statutory authority submitted in its favor, it remains more analogous to the Buildings Act in the most critical way: the PHRA simply does not provide clear statutory authority to go as far as the City did with the Ordinance. Consequently, the Nondiscrimination Ordinance must yield to the Business Exclusion.

We affirm the Commonwealth Court's entry of judgment in favor of Apartment Association.

Justices Todd, Donohue and Dougherty join the opinion.

Justice Saylor files a concurring opinion in which Chief Justice Baer and Justice Mundy join.